# IN THE SUPREME COURT OF IOWA

No. 60 / 06-1074

Filed November 30, 2007

**IN THE INTEREST OF A.W. and S.W.,**
**Minor Children,**

**WOODBURY COUNTY ATTORNEY**
**and A.W. and S.W., MINOR CHILDREN,**

Appellants,

vs.

**IOWA ATTORNEY GENERAL**
**and WINNEBAGO TRIBE OF NEBRASKA,**

Appellees.

---

Appeal from the Iowa District Court for Woodbury County, Brian L. Michaelson, Associate Juvenile Judge.

The Woodbury County Attorney and the guardian ad litem for A.W. and S.W. appeal from a juvenile court order authorizing the Winnebago Tribe of Nebraska to intervene in a child-in-need-of-assistance proceeding. **REVERSED AND REMANDED.**

Patrick Jennings, County Attorney, and David A. Dawson, Assistant County Attorney, for appellant Woodbury County Attorney.

Michelle M. Dreibelbis of the Juvenile Law Center, Sioux City, for appellants minor children.

Thomas J. Miller, Attorney General, and Bruce Kempkes, Assistant Attorney General, for appellee Iowa Attorney General.

Martha M. McMinn, Sioux City, for appellee the Winnebago Tribe of Nebraska.

**HECHT, Justice.**

The juvenile court concluded A.W. and S.W. are "Indian children" as defined in the Iowa Indian Child Welfare Act, Iowa Code chapter 232B (2005) (Iowa ICWA), and granted the Winnebago Tribe of Nebraska's petition to intervene in a child-in-need-of-assistance (CINA) proceeding. On appeal, the county attorney and the guardian ad litem for the children whose interests are at issue in this case challenge the Winnebago Tribe's status as the "Indian child's tribe" and the constitutionality of the Iowa ICWA. We grant the Iowa Attorney General's motion to dismiss the county attorney's appeal, and we conclude the Iowa ICWA definition of "Indian child" violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Accordingly, we reverse the juvenile court's ruling granting the Tribe's petition to intervene.

## I. Factual and Procedural Background.

To place into context the unique issues involved in this case, a brief discussion of the historical background of the federal ICWA[1] is useful. Studies in the late 1960s and early 1970s showed "25 to 35% of all Indian children had been separated from their families and placed in adoptive families, foster care, and institutions." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 1600, 104 L. Ed. 2d 29, 36 (1989) (citing Indian Child Welfare Program Hearings before the Subcommittee on Indian Affairs of the Senate Committee on Interior and Insular Affairs, 93d Cong., 2d Sess., 3 (statement of William Byler) (hereinafter 1974 Hearings); H.R. Rep. No. 95-1386, p. 9 (1978)). Testimony taken during the congressional hearings that led to the federal ICWA legislation suggested "[t]he adoption rate of Indian children was eight times

---

[1] 25 U.S.C. §§ 1901–1963 (2003).

that of non-Indian children." *Id.* (citing 1974 Hearings at 75-83). In his 1978 testimony before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, Chief Calvin Isaac of the Mississippi Band of Choctaw Indians asserted the drain of Indian children from reservations was due to "nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing." *Id.* (citing Hearings on S. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess. (testimony of Calvin Isaac)). Chief Isaac also observed in his hearing testimony that "[m]any of the individuals who decide the fate of [native] children are at best ignorant of [Indian] cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child." *Id.*

> Congress enacted the federal ICWA in 1978 in response to its
>
> rising concern in the mid-1970s over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.

*Id.* at 32, 109 S. Ct. at 1600, 104 L. Ed. 2d at 36. Responding to an "Indian child welfare crisis . . . of massive proportions," H.R. Rep. No. 95-1386, p. 9, Congress incorporated the following findings in the statute:

> (1) that clause 3, section 8, article I of the United States Constitution provides that "The Congress shall have Power * * * To regulate Commerce * * * with Indian tribes" and, through this and other constitutional authority, Congress has plenary power over Indian affairs;
>
> (2) that Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources;

(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901 (2003). The legislation declared it federal policy to

protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .

*Id.* § 1902. In defining the reach of the federal legislation, Congress defined an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4).

In furtherance of the federal policy to protect Indian children and their relationships with the tribes with which they might be affiliated, the federal ICWA requires the court to notify an Indian child's tribe of any child custody proceeding involving the child, and provides for three types of tribal involvement.[2] *Id.* § 1912(a). First, tribes have exclusive jurisdiction over child custody proceedings involving Indian children domiciled on the tribe's reservation. *Id.* § 1911(a). Second, state courts are required, unless good

---

[2]The "Indian child's tribe" is "the Indian tribe in which an Indian child is a member or eligible for membership." 25 U.S.C. § 1903(5)(a).

cause otherwise dictates, to transfer to tribal court any proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled on the reservation. *Id.* § 1911(b). Finally, the Indian child's custodian and the Indian child's tribe have the right to intervene at any point in a state court foster care or termination proceeding. *Id.* § 1911(c).

The federal ICWA also provides substantive protections for Indian children, parents, and Indian custodians, including placement preferences for the families and tribes of Indian children involved in child custody proceedings. *See id.* § 1915. It also allows states to apply their own "standard[s] of protection to the rights of the parent or Indian custodian of an Indian child" if they are higher than the federal ICWA standards. *Id.* § 1921.

In 2003, the Iowa General Assembly enacted the Iowa ICWA to "clarify state policies and procedures regarding implementation" of the federal ICWA. Iowa Code § 232B.2 (2007).[3] The Iowa ICWA and the federal ICWA are not completely coterminous, however, as the Iowa ICWA provides for several areas of greater protection to Indian families and tribes. One instance in which the Iowa ICWA purports to expand upon the protections afforded by the federal ICWA is in the definition of "Indian child."[4] As we

---

[3]The federal ICWA does not mandate the states adopt complementary ICWA legislation. Iowa is one of the few states to adopt comprehensive complementary ICWA statutes, which in some areas duplicate, but in other areas expand upon, the protections granted by the federal ICWA. *See* Iowa Code §§ 232B.1–232B.14; Minn. Stat. §§ 260.751–260.835 (2007); Neb. Rev. Stat. §§ 43-1501 to 43-1516 (2007); Okla. Stat. tit. 10, §§ 40.1–40.9 (2007).

[4]Iowa and Washington are the only states with broader definitions of "Indian child" than the federal ICWA. *See* Wash. Rev. Code § 13.70.150(1) (2007) (permitting appointment of an Indian child welfare advisory committee "[i]f a case involves an Indian child, as defined by 25 U.S.C. § 1903 *or by department rule or policy*" (emphasis added)); Wash. Admin. Code r. 388-70-091 (2007) (defining "Indian," in rules for foster care planning for Indian children, as including "[a]n unenrolled Indian: A person considered to

have already noted, the federal ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). The Iowa ICWA defines an "Indian child" as "an unmarried Indian person who is under eighteen years of age or a child who is under eighteen years of age that *an Indian tribe identifies as a child of the tribe's community*." Iowa Code § 232B.3(6) (emphasis added). Thus, unlike the federal statute, section 232B.3(6) purports to include within the definition of "Indian child" children without regard to whether they are members of a tribe nor eligible for membership.

The Winnebago Tribe of Nebraska is a federally recognized Indian Tribe located in northeastern Nebraska. Children of tribe members are eligible for membership provided they "possess at least one-fourth degree Winnebago Indian blood."[5] To assist the Tribe's ICWA specialists in deciding whether a child is properly identified as a "child of the tribe's community" and therefore an "Indian child" under the Iowa ICWA, the Winnebago Tribal Council adopted resolution #04-26 on January 21, 2004. This resolution states: "[F]or purposes of determining the applicability of the

---

be an Indian by a federally or nonfederally recognized Indian tribe or urban Indian/Alaskan native community organization). Although rule 388-70-091 has been a part of the Washington Administrative Code since 1976, it does not appear it has been subjected to a constitutional challenge.

The Oregon statutory definition of "Indian child" appears to allow for an expansion of the federal definition; however, it has been construed as coextensive with the federal definition. *State ex rel. State Office for Services to Children & Families v. Klamath Tribe*, 11 P.3d 701, 706 (Or. Ct. App. 2000) (construing Ore. Rev. Stat. § 419A.004(13), which includes in the definition of "Indian child" a child "covered by the terms of an Indian Child Welfare Act agreement between Oregon and an Indian tribe," to encompass only those children covered by the federal ICWA).

[5]Winnebago Tribe of Nebraska Constitution, Art. II, sec. 1(c).

Iowa ICWA, any child of an enrolled Winnebago tribal member shall be included as a child of the Winnebago tribal community."

A.W. and S.W. were born in Sioux City, and continue to reside there. There is no evidence in the record tending to prove the children have ever lived on the Winnebago Reservation. They are the biological children of Tina, an enrolled Winnebago Tribe member who possesses one-fourth degree Winnebago blood. Anthony, the father of A.W. and S.W, is Caucasian. A.W. and S.W. therefore possess one-eighth degree Winnebago blood. Because they have less than one-fourth degree Winnebago blood, A.W. and S.W. are neither enrolled nor eligible to enroll in the Winnebago Tribe. Under the tribe's resolution #04-26, however, A.W. and S.W. are "children of the Winnebago tribal community" for purposes of the Iowa ICWA because they are the children of a member.

A history of substance abuse by Tina and Anthony led the State to temporarily remove A.W. and S.W. from their home. A petition alleging the children were in need of assistance was filed in the juvenile court. The Winnebago Tribe filed a motion to intervene in the proceeding, alleging, in relevant part, A.W. and S.W. are Indian children under the Iowa ICWA. *See* Iowa Code § 232B.3(6) (defining "Indian child"). The Woodbury County Attorney and the children's guardian ad litem resisted the Tribe's motion to intervene, contending: (1) the Iowa ICWA is unconstitutional because it violates the Indian Commerce, Supremacy, and Due Process Clauses of the United States Constitution and the Equal Protection Clauses of both the United States and Iowa Constitutions; (2) the Winnebago Tribe's resolution #04-26 is not entitled to full faith and credit; and (3) the Winnebago Tribe is not the "Indian child's tribe," as defined in Iowa Code section 232B.3(8). The department of human services did not object to the Tribe's motion to

intervene or the applicability of the Iowa ICWA to A.W. and S.W. The juvenile court adjudicated A.W. and S.W. CINA under sections 232.2(6)(*b*), (*c*)(2), (*n*) and (*o*) and scheduled a hearing on the Winnebago Tribe's motion to intervene.

The juvenile court held a hearing on the motion to intervene on November 21, 2005. Because the Winnebago tribe did not appear at this hearing or present evidence, the juvenile court held the Iowa ICWA was inapplicable. The court also ordered that custody of the children should remain with the department of human services for placement in foster or relative care.

Less than five months after the hearing on the motion to intervene, Anthony and Tina had stopped working toward substance abuse recovery and reunification with A.W. and S.W., and the juvenile court ordered the Woodbury County Attorney to file a termination of parental rights petition. The Woodbury County Attorney filed a petition seeking termination of Anthony and Tina's parental rights with regard to both children on April 7, 2006. Notice of the filing of the petition was served on the Winnebago Tribe.

Thereafter, the juvenile court held another hearing on the Winnebago Tribe's motion to intervene. The court concluded the Iowa ICWA definition of "Indian child" was neither vague nor overbroad and that it did not violate the Supremacy, Indian Commerce, Equal Protection or Due Process Clauses. The court also concluded: (1) the Winnebago Tribe's resolution #04-26 is entitled to full faith and credit, (2) the Iowa ICWA is applicable because A.W. and S.W. are "Indian children" under section 232B.3(6), and (3) the Winnebago Tribe may intervene as the "Indian child's tribe" under section 232B.5(14).

The guardian ad litem and the Woodbury County Attorney, claiming to act for himself and the State of Iowa, appealed from the ruling on the motion to intervene.[6] The Iowa Attorney General moved to dismiss the appeals, contending: (1) the guardian ad litem and the Woodbury County Attorney are "prevailing parties" not entitled to appeal the intervention ruling; (2) a county attorney does not have a right to file an appeal or appear in the appellate courts in CINA proceedings without the consent of the attorney general; (3) a county attorney does not have authority to attack the constitutionality of state statutes, such as the Iowa ICWA. We previously rejected the attorney general's "prevailing party" argument by order and directed the submission of the other two arguments with this appeal. *See* Iowa R. App. P. 6.22(4) ("Resisted motions will be ruled on by the appropriate appellate court or justice or judge thereof after the expiration of at least seven days from the serving of the resistance, unless such court, justice or judge orders a different time for submission of the motion.").

## II.     Motion to Dismiss.

Before reaching the merits of the appellants' arguments, we address the attorney general's motion to dismiss the Woodbury County Attorney from this appeal. The attorney general contends the Woodbury County Attorney may not represent the State of Iowa in the appellate courts without authorization from the attorney general. He further argues a county attorney has no standing to challenge the constitutionality of a state statute. The county attorney contends he is a party in interest in this

---

[6]In a later ruling, the juvenile court terminated Tina and Anthony's parental rights pursuant to sections 232.116(1)(*b*), (*d*), (*e*) and (*l*) (both children), (*f*) (S.W. only), and (*h*) (A.W. only). The merits of that ruling are not at issue in this appeal. We granted leave for interlocutory appeal on the issue of the applicability of the Iowa ICWA to these children.

appeal; and, in the alternative, he urges us to consider the arguments in his brief as though he were in the status of amicus curiae.

A.     **Representation of the State in CINA Appeals.**  The offices of attorney general and county attorney are creatures of statute, and the respective authority of each person holding them is detailed in the Iowa Code.  *See Cosson v. Bradshaw*, 160 Iowa 296, 301, 141 N.W. 1062, 1063–64 (1913) ("The duties and powers of the Attorney General are defined by statute, and we take it that the Legislature has given to him by the statute all the powers that in their judgment he ought to be permitted to exercise, and they imposed upon him all the duties which, in their judgment, should be imposed upon him as such officer.").  Iowa Code chapter 13 defines the duties and powers of the attorney general:

> It shall be the duty of the attorney general, except as otherwise provided by law, to:
>
> (1)     Prosecute and defend all causes in the appellate courts in which the state is a party or interested.
>
> (2)     Prosecute and defend in any other court or tribunal, all actions and proceedings, civil or criminal, in which the state may be a party or interested, when, in the attorney general's judgment, the interest of the state requires such action, or when requested to do so by the governor, executive council, or general assembly.
>
> . . . .
>
> (8)     Supervise county attorneys in all matters pertaining to the duties of their offices . . . .

Iowa Code § 13.2.  In contrast, it is the county attorney's duty to "[a]ppear for the state and the county in all cases and proceedings *in the courts of the county* to which the state or the county is a party . . . and appear in the appellate courts in all cases in which the county is a party . . . ."  Iowa Code § 331.756(2) (emphasis added).  Thus, the Iowa Code, as a general

proposition, designates the county attorney as the representative of the State of Iowa in the district courts, and the attorney general as the State's representative in the appellate courts. Absent a specific statutory directive to the contrary, county attorneys' appearances in the appellate courts are limited to representation of the interests of the county.

The county attorney contends the legislature intended a different arrangement in CINA cases. Iowa Code section 232.90(1) states "[t]he county attorney shall represent the state in proceedings arising from a [CINA petition] and shall present evidence in support of the petition." The county attorney argues this statute is a specific grant of authority to county attorneys to represent the State in both the juvenile and the appellate courts. We disagree. Section 232.90(1) does not mention appeals in CINA cases, and there is nothing in the statute suggesting a legislative intent to alter the standard division of authority between the attorney general and county attorneys. In fact, the only specific duty of county attorneys mentioned in the statute is the duty to "present evidence in support of the petition," which is a reference only to representation of the State's interests in the juvenile court.[7] We believe if the General Assembly had intended to grant county attorneys broader authority to represent the State's interests in the appellate courts in cases in which counties are not parties to the litigation, it would have done so explicitly in section 331.756(2) or chapter 232.

---

[7]Even in the juvenile court, the county attorney does not have the exclusive authority to represent the interests of the State. Section 232.90(2) indicates that in instances of "disagreement between the department [of human services] and the county attorney regarding the appropriate action to be taken [in matters pending before the juvenile court], the department may request to be represented by the attorney general in place of the county attorney." The statute thus recognizes that, as they are representatives of the same interests, when conflicts arise between the attorney general and a county attorney regarding the prosecution of a CINA matter, the attorney general shall represent the State's interest even in the juvenile court.

The county attorney, relying on *Motor Club of Iowa v. Department of Transportation*, 251 N.W.2d 510 (Iowa 1977), next argues his right of free access to the courts will be abridged, and important interests, issues, and arguments will be forsaken, if he is not permitted to represent the State's interests in CINA appeals. In *Motor Club*, the Iowa Department of Transportation (IDOT) adopted a rule establishing a sixty-five-foot length limitation for trucks. The rule was invalidated by the district court because preconditions to the implementation of the rule were not met. 251 N.W.2d at 512. After an appeal was filed, a majority of the seven IDOT commissioners no longer favored the length limitation, and the IDOT thus sought to dismiss the appeal and abide by the district court's decision. The attorney general refused, claiming the State of Iowa was the real party in interest and that [the attorney general] is a constitutional officer, free to prosecute and defend any case in which the State is a party or interested." *Id.* at 513. The attorney general also asserted "he possesse[d] complete dominion over all litigation in which he appear[ed] in the interest of the State." *Id.*

In response to the attorney general's "complete dominion" argument, we first noted the general rule that an attorney for a private litigant under the same circumstances would be required to dismiss the appeal. *Id.* After acknowledging the attorney general has only the powers granted to him by statute, we found the statutory grants of authority to the attorney general essentially created a normal attorney-client relationship between the attorney general and the IDOT. Thus, the attorney general did not have "complete dominion" over the litigation, and in the eventuality of a change in department position during the litigation, "had no power to impose his will on the department." *Id.* at 516.

Unlike the relationship between the IDOT and the attorney general at issue in *Motor Club*, the county attorney and attorney general do not stand in an "attorney-client" relationship. The department of human services is the county attorney's "client" in CINA cases. Iowa Code § 232.90(2) ("The county attorney shall represent the department in proceedings arising under this division."). In this case, the department did not wish to assail the constitutionality of the Iowa ICWA, and it raised no objection to intervention by the Winnebago Tribe. Under *Motor Club* and section 232.90(2), the county attorney had a duty to advocate the department's position or advise the department to request the attorney general to replace the county attorney as the department's representative. The county attorney did not have the right to "assert his [independent] vision of the state interest." *Motor Club*, 251 N.W.2d at 514.

We also find dubious the county attorney's assertion that, absent his participation in CINA appeals, important interests, issues, and arguments will never be raised. This contention is blunted where, as in this case, the positions of the county attorney and guardian ad litem are parallel. Both the county attorney and the guardian ad litem incorporate by reference the other's arguments. We believe the guardian ad litem is fully capable of representing the children's interests in this case, just as the attorney general is fully capable of representing the State's interests.

The county attorney further contends his obligations to implement Iowa Code chapters 232 and 232B necessarily bestow upon him the status of a "party in interest" in CINA cases. He cites *In re K.C.*, 660 N.W.2d 29 (Iowa 2003) as authority for the proposition that a county attorney may appeal from a juvenile court order directing the filing of a petition for termination of parental rights. In that case, the guardian ad litem of the

affected children, the children's parents, and the county attorney who opposed the termination of the parents' rights filed petitions for interlocutory appeal. We granted the petitions. On appeal, the county attorney contended, *inter alia,* she could not ethically comply with the juvenile court's order because the evidence would not support termination of the parents' rights. The State joined the guardian ad litem, the parents, and the county attorney in asserting the juvenile court should not have directed the county attorney to initiate termination proceedings. It is immediately apparent that *In re K.C.* is distinguishable from the case now before the court in important particulars. The State did not challenge the legality of the county attorney's status as a party in interest in *In re K.C.,* but it has in this case. *See Coralville Hotel Assocs., L.C. v. City of Coralville,* 684 N.W.2d 245, 249 (Iowa 2004) (noting cases are generally decided only on issues raised, argued, and briefed by the parties (citing *Sager v. Farm Bureau Mut. Ins. Co.,* 680 N.W.2d 8, 14 (Iowa 2004))). *In re K.C.* is therefore inapposite, and the county attorney's reliance on it is misplaced.

Thus, the State of Iowa, appearing in the juvenile court through the department of human services, is a "party in interest" in CINA cases. Iowa Code §§ 217.1, 232.90(1), (2); Iowa R. Civ. P. 1.201 ("Every action must be prosecuted in the name of the real party in interest."). County attorneys, who bear a statutory duty to represent the interests of the State in the juvenile court, do not appear as parties in interest in such cases in the juvenile court or on appeal, just as they do not enjoy the status of parties in many other types of cases within their statutory responsibility. *See generally* Iowa Code § 331.756.

We next consider the Woodbury County Attorney's request to appear as an amicus curiae in this appeal. Iowa Rule of Appellate Procedure 6.18

details the standards and procedure for filing amicus curiae briefs. Iowa R. App. P. 6.18(1) ("A brief of an amicus curiae may be served and filed only by leave of the appropriate appellate court granted on motion served on all parties, at the request of the appropriate appellate court, or when accompanied by the written consent of all parties. The brief may be conditionally served and filed with a motion for leave. A motion for leave shall identify the interest of the applicant and shall state the reasons a brief of an amicus curiae is desirable."); Iowa R. App. P. 6.18(3) ("A brief of an amicus curiae shall not exceed 25 pages in length and shall have a green cover."). The county attorney has not complied with the procedural or form requirements of rule 6.18(1) or (3), and we therefore deny his request to appear in this case as an amicus curiae.

Despite the fact the county attorney is neither a party nor amicus curiae, we nonetheless will consider on the merits the arguments contained in the county attorney's brief under the special circumstances of this case. The parties proceeded through briefing and oral argument in this matter as if the county attorney were a proper appellant. Before both the juvenile court and this court, the guardian ad litem has joined in and adopted the county attorney's arguments as a matter of convenience and efficiency. Iowa R. App. P. 6.14(10) ("In cases involving more than one appellant or appellee, including cases consolidated for purposes of the appeal, any number of either may join in a single brief, and any appellant or appellee may adopt by reference any part of the brief of another."). We therefore consider the arguments made in the county attorney's brief as if they had been made by the guardian ad litem, whose brief incorporated them.

**B.** **County Attorney's Challenge to the Constitutionality of a State Statute.** Our conclusion that the county attorney is not a proper

party in this appeal renders moot the question of whether the county attorney may argue against the constitutionality of the Iowa ICWA in this case. While we typically do not decide moot issues, we have recognized an exception to this general rule. *In re S.P.*, 719 N.W.2d 535, 537 (Iowa 2006). In determining whether to decide a moot issue, we consider:

> (1) the private or public nature of the issue; (2) the desirability of an authoritative adjudication to guide public officials in their future conduct; (3) the likelihood of the recurrence of the issue; and (4) the likelihood the issue will recur yet evade appellate review.

*Id.* (citing *In re T.S.*, 705 N.W.2d 498, 502 (Iowa 2005)). The last factor is perhaps the most important factor, because "[i]f a matter will likely be mooted before reaching an appellate court, the issue will never be addressed." *State v. Hernandez-Lopez*, 639 N.W.2d 226, 234 (Iowa 2002).

The standing of a county attorney, while representing the State in litigation, to challenge the constitutionality of state statutes is an issue of public importance. We have previously concluded neither the attorney general nor a county may challenge the constitutionality of a state statute while acting as a litigant. *See Iowa Auto Dealers Ass'n v. Iowa State Appeal Bd.*, 420 N.W.2d 460, 462 (Iowa 1988) (attorney general); *Polk County v. Iowa State Appeal Bd.*, 330 N.W.2d 267, 271–72 (Iowa 1983) (county). We have not had occasion, however, to decide the question whether a county attorney has authority to challenge a state statute while representing the State as a litigant in the juvenile court.[8] We believe this issue is likely to recur in ICWA cases, and our decision in this case will therefore provide needed guidance to county attorneys throughout the state as to their duties

---

[8]This is not the first juvenile court case in which a county attorney has raised a constitutional challenge against a State statute. *See, e.g., In re M.T.*, 714 N.W.2d 278, 281 (Iowa 2006) (declining to address the issue because the court lacked jurisdiction to hear the appeal); *In re K.C.*, 660 N.W.2d 29 (Iowa 2003) (addressing issues raised on appeal by a county attorney in a case in which his authority to raise the issues was not challenged).

and authority as counsel for the State in such cases. And because we have decided a county attorney has no authority to represent the State in appeals from the juvenile court, the question will, if not decided here, continue to evade appellate court review because it will never "last long enough for complete judicial review." *Super Tire Eng'g Co. v. McCorkle*, 417 U.S. 115, 126, 94 S. Ct. 1694, 1700, 40 L. Ed. 2d 1, 10 (1974). Therefore, we exercise our discretion to address a county attorney's standing to challenge the constitutionality of a state statute while representing the State in litigation.

As discussed in the previous section of this opinion, the county attorney and attorney general have identical interests while acting as representatives of the State of Iowa. Given the attorney general's statutory duty as counsel to the General Assembly, we have stated it is inappropriate for the attorney general to appear "as a litigant challenging an Iowa statute." *Iowa Auto Dealers Ass'n*, 420 N.W.2d at 462; *State ex rel. Fletcher v. Executive Council*, 207 Iowa 923, 925, 223 N.W. 737, 738 (1929) (noting a call by the General Assembly to the attorney general to test the constitutionality of a legislative act "put him in a position which [was] repugnant to his other official duties [as legal advisor to the General Assembly]"). While a county attorney does not have a similar statutory duty to provide counsel to the General Assembly, we see no meaningful distinction between his position and that of the attorney general while representing the State's interests in litigated matters. It would be illogical to allow a constitutional challenge of a statute by a county attorney representing the State in district court, while precluding the attorney general handling the same case on appeal from making the same argument.

We have also held counties, as creatures of statute, have no standing to challenge the constitutionality of state statutory provisions. *Charles*

*Hewitt & Sons Co. v. Keller*, 223 Iowa 1372, 1377, 275 N.W. 94, 97 (1937) ("Counties and other municipal corporations are, of course, the creatures of the legislature; they exist by reason of statutes enacted within the power of the legislature, and we see no sound basis upon which a ministerial (or, for that matter, any other) office may question the laws of its being. The creature is not greater than its creator, and may not question that power which brought it into existence and set the bounds of its capacities."); *accord Bd. of Supervisors of Linn County v. Dept. of Revenue*, 263 N.W.2d 227, 232–34 (Iowa 1978). Even if the county had a particularized interest in CINA matters, *Keller* denies it standing to challenge the constitutionality of the Iowa ICWA. The county attorney's authority to act on behalf of either the county or the State is derived from the legislature, and he therefore may not challenge the constitutionality of legislative acts in court while representing the interests of the State.

Finally, the county attorney contends he may challenge the constitutionality of state legislation because his oath of office requires him to "support the Constitution of the United States and the Constitution of the state of Iowa." Iowa Code § 63.10. Our response to a similar claim in *Board of Supervisors of Linn County* is sufficient to dispose of this argument: "The answer to that course of reasoning is that his oath does not require him to obey the Constitution as he decides, but as judicially determined." 263 N.W.2d at 234 (quoting *State ex rel. Clinton Falls Nursery Co. v. Steele County Bd. of Comm'rs*, 232 N.W. 737, 738 (Minn. 1930)).

### III.   Merits.

The guardian ad litem first contends the Winnebago Tribe of Nebraska could not intervene because it is not the "Indian child's tribe" as defined in Iowa Code section 232B.3(8). She also raises several constitutional

challenges to the Iowa ICWA. We find the definition of "Indian child's tribe" in Iowa Code section 232B.3(8) includes tribes which have identified a child as a "child of the tribe's community." Additionally, because we find meritorious the guardian ad litem's equal protection claim, we reserve opinion on the remaining constitutional issues.

**A.  Scope of Review.**  We review issues of statutory construction for errors at law. *Callender v. Skiles*, 591 N.W.2d 182, 184 (Iowa 1999). We exercise de novo review of constitutional claims. *Kistler v. City of Perry*, 719 N.W.2d 804, 805 (Iowa 2006).

**B.  Section 232B.3(8).**  The guardian ad litem contends the Winnebago Tribe of Nebraska is not a proper intervening tribe because it is not the "Indian child's tribe" as defined by the Iowa ICWA. Iowa Code section 232B.3(8) states the "Indian child's tribe" is "a tribe in which an Indian child is a member or eligible for membership." Our goal in construing statutes is to seek a "reasonable interpretation that will best effect the purpose of the statute." *State ex rel. Schuder v. Schuder*, 578 N.W.2d 685, 687 (Iowa 1998). Although the definition of "Indian child's tribe" refers only to children who are "member[s] or eligible for membership," we believe the legislature's use of the previously defined term "Indian child" manifests its intent to incorporate the entire "Indian child" definition into section 232B.3(8). Were we to hold otherwise, the expanded definition of "Indian child" found in section 232B.3(6) would be rendered a nullity because no tribe identifying a nonmember, noneligible child as a "child of the tribe's community" would ever be the "Indian child's tribe." Thus, we conclude the Winnebago Tribe, as the tribe identifying A.W. and S.W. as children of its community, would fall within the definition of "Indian child's tribe" under the Iowa ICWA.

**C.** **Equal Protection.** Because we conclude the General Assembly intended for tribes asserting an interest in a child as a "child of the tribe's community" to have intervention rights, we must examine the constitutionality of applying the Iowa ICWA to A.W. and S.W. The guardian ad litem asserts the Iowa ICWA definition of "Indian child" violates the Equal Protection Clauses of the United States and Iowa Constitutions because it traverses the boundaries of the federal government's "trust" authority with respect to Indian tribes, and creates an impermissible racial classification. The attorney general responds that the Iowa ICWA definition of "Indian child" is a permissible exercise of the federal trust authority, as delegated to the state by the federal ICWA, 25 U.S.C. § 1921.

Where, as here, equal protection challenges are asserted under both the federal and state constitutions, it is the "exclusive prerogative of [the Iowa Supreme Court] to determine the constitutionality of Iowa statutes challenged under our own constitution." *Callender*, 591 N.W.2d at 187. "Thus, while federal court analysis of similar provisions in the United States Constitution may prove helpful, those interpretations do not bind us." *Santi v. Santi*, 633 N.W.2d 312, 317 (Iowa 2001) (quoting *Callender*, 591 N.W.2d at 187). Although we have reserved the right to reject the equal protection constructs employed by the Supreme Court in its interpretation of the Equal Protection Clause of the United States Constitution when we interpret the equality provision found in article I, section 6 of the Iowa Constitution, we again choose not to adopt our own analytical framework because the parties have not asserted "an analysis that might be more compatible with Iowa's constitutional language." *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 6 (Iowa 2004).

Our analysis of an equal protection challenge begins with identification of the classification at issue.[9] *Ames Rental Property Ass'n v. City of Ames*, 736 N.W.2d 255, 259 (Iowa 2007). The Iowa ICWA creates two classes of children—Indian children and non-Indian children. The federal ICWA and the Iowa ICWA only apply in CINA and termination-of-parental-rights cases when Indian children are involved.[10] Such cases involving non-Indian children need only comply with the provisions of Iowa Code chapter 232.[11] The Iowa ICWA, when combined with Winnebago tribal resolution #04-26, places ethnic Indian children in the same class as tribal Indian children, and separates them from other non-Indian children who are ineligible for membership in an Indian tribe. *See Morton v. Mancari*, 417 U.S. 535, 554 n.24, 94 S. Ct. 2474, 2484 n.24, 41 L. Ed. 2d 290, 294 n.24 (1974) (distinguishing between members of federally recognized tribes and individuals racially identified as "Indians"); *see also* John Robert Renner,

---

[9]Neither Tina nor Anthony has appealed the intervention order. Thus, our analysis is limited to the rights of A.W. and S.W. to equal protection.

For simplicity, we will refer generally to those children who have some Indian blood but are not members or eligible for membership in an Indian tribe as "ethnic" Indian children. We will refer to children who are members or eligible for membership in an Indian tribe as "tribal" Indian children. *See* John Robert Renner, *The Indian Child Welfare Act and Equal Protection Limitations on the Federal Power Over Indian Affairs*, 17 Am. Indian L. Rev. 129, 163 (1992).

[10]The Iowa ICWA makes the entire federal ICWA applicable to any child custody proceeding involving an Indian child, as defined by the Iowa ICWA. Iowa Code § 232B.5(2) ("The federal [ICWA] and this chapter are applicable without exception in any child custody proceeding involving an Indian child.").

[11]The Iowa ICWA, through its incorporation of the federal ICWA, provides for higher standards than Iowa Code chapter 232 in several areas. For example, Iowa Code section 232.116(1) requires a finding of abandonment or neglect by clear and convincing evidence to terminate parental rights. In contrast, in an ICWA case, a termination of parental rights may only be ordered upon "a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f).

*The Indian Child Welfare Act and Equal Protection Limitations on the Federal Power Over Indian Affairs*, 17 Am. Indian L. Rev. 129, 168–69 (1992) (discussing equal protection ramifications of expanding the federal ICWA definition of "Indian child" to include ethnic Indian children) [hereinafter Renner, *Indian Child Welfare Act and Equal Protection*]; Barbara Ann Atwood, *Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance*, 51 Emory L. J. 587, 662 n.188 (2002).

In order to determine whether the classification of ethnic Indian children as "Indian children" for purposes of the Iowa ICWA is a racial classification, an understanding of the state's authority to legislate with respect to Indians is necessary. Due to our nation's historical relationship with Indian tribes, the federal government has taken upon itself a trust relationship with Indian tribes, generally to the exclusion of any state authority in Indian affairs:

> This [federal] power is not expressly granted in so many words by the Constitution, except with respect to regulating commerce with the Indian tribes, but its existence cannot be doubted. In the exercise of the war and treaty powers, the United States overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people needing protection against the selfishness of others and their own improvidence. Of necessity the United States assumed the duty of furnishing that protection and with it the authority to do all that was required to perform that obligation and to prepare the Indians to take their place as independent, qualified members of the modern body politic.

*Board of Comm'rs of Creek County v. Seber*, 318 U.S. 705, 715, 63 S. Ct. 920, 926, 87 L. Ed. 1094, 1102–03 (1943); *see also United States v. Kagama*, 118 U.S. 375, 383–84, 6 S. Ct. 1109, 1114, 30 L. Ed. 228, 231 (1886) ("[Indian tribes] owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness

and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power."). Although responsibility for maintaining this trust relationship with Indian tribes has historically been the exclusive prerogative of the federal government, the Supreme Court has recognized states may exercise the federal trust authority when specifically authorized to do so by a federal statute. *See Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 500–01, 99 S. Ct. 740, 761, 58 L. Ed. 2d 740, 768 (1979) (holding states, in exercising the federal trust power over Indian tribes pursuant to a federal statute authorizing them to do so, may enact legislation that would be an otherwise unconstitutional exercise of state power).

There are generally two situations in which states may legislate on behalf of Indians in order to further the purposes of the federal trust authority:

> [I]n the first, the state acts under a particularized, state-specific congressional delegation of jurisdiction; in the second, the state acts to accommodate federal supremacy in the field by enforcing congressionally created federal obligations toward Indian tribes that the federal government would otherwise enforce on its own.

*Malabed v. North Slope Borough*, 70 P.3d 416, 423 (Alaska 2003).

We are not presented in this case with a claim that the Iowa ICWA constitutes an instance of state enforcement of a federal obligation to Indian tribes. Instead, the attorney general contends the federal ICWA is a congressional delegation of its jurisdiction over Indian affairs to the states. *See* Iowa Code § 232B.2. The federal ICWA clearly invokes the federal government's trust authority as its basis. 25 U.S.C. § 1901(1), (2). Because all child custody proceedings occur in state courts, the federal ICWA is

necessarily a delegation of the federal trust authority to the states for the protection of Indian tribes. The General Assembly enacted the Iowa ICWA pursuant to this delegation of the federal trust authority. Iowa Code § 232B.2. It therefore may legislate only within the bounds of Congress's authority to enact legislation favoring Indians.[12]

The United States Supreme Court has upheld numerous federal statutes singling out tribal Indians for special treatment. *See, e.g.*, *Seber*, 318 U.S. 705, 63 S. Ct. 920, 87 L. Ed. 2d 1094 (federally granted tax immunity); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S. Ct. 1257, 36 L. Ed. 2d 129 (1973) (same); *Morton*, 417 U.S. 535, 94 S. Ct. 2474, 41 L. Ed. 2d 290 (upholding Bureau of Indian Affairs (BIA) employment preference for members of federally recognized Indian tribes). *Morton* provides the following rationale for upholding federal Indian preferences against an equal protection challenge:

> The preference is not directed towards a "racial" group consisting of "Indians"; instead, it applies only to members of "federally recognized" tribes. This operates to exclude many individuals who are racially to be classified as "Indians." In this sense, the preference is political rather than racial in nature.

417 U.S. at 554 n.24, 94 S. Ct. at 2484 n.24, 41 L. Ed. 2d at 302–03 n.24. Thus, federal preferences are "granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities." *Id.* at 554, 94 S. Ct. at 2484, 41 L. Ed. 2d at 302–03. "As long as the special treatment can be rationally tied to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* at 555, 94 S. Ct. at 2485, 41 L. Ed. 2d at 303. The *Morton*

---

[12]We resolve this case on delegation grounds; therefore we state no opinion as to whether the State of Iowa has inherent authority to enact legislation on behalf of Indian tribes. It is axiomatic, however, that even if the State may unilaterally legislate on behalf of Indian tribes, such legislation must comport with equal protection requirements.

Court held BIA employment preferences in favor of individuals who possessed one-fourth or more degree of Indian blood and were members of federally recognized tribes, despite the "racial" blood quantum component, were "reasonable and rationally designed to further Indian self government," due to the unique role the BIA plays in tribal government. *Id.* ("In the sense that there is no other group of people favored in this manner, the legal status of the BIA is truly sui generis.").

Subsequent United States Supreme Court and lower court decisions confirm that Congress may constitutionally legislate only with respect to tribal Indians. *See United States v. Antelope*, 430 U.S. 641, 645, 97 S. Ct. 1395, 1399, 51 L. Ed. 2d 701, 707 (1977) ("Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a 'racial' group consisting of 'Indians.' "(Internal quotation omitted.)); *Rice v. Cayetano*, 528 U.S. 495, 120 S. Ct. 1044, 145 L. Ed. 2d 1007 (2000); *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210, 1215 (5th Cir. 1991) (noting "only the constituencies over whom the federal government considers itself guardian enjoy the [political] preference"). In *Rice v. Cayetano*, the Court invalidated a Hawaiian constitutional provision requiring members of the Office of Hawaiian Affairs (OHA), a committee established to administer income from lands held by the state "as a public trust" pursuant to federal statute,[13] be "Hawaiian" and be elected only by "Hawaiians." 528 U.S. at 509–10, 120 S. Ct. at 1052–53, 145 L. Ed. 2d at 1021. As used in the Hawaiian constitution, the term "Hawaiian" referred to "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised

_____

[13]The federal statute, the Admission Act, Pub. L. 86-3, 73 Stat. 5, granted Hawaii approximately 1.4 million acres of land "to be held 'as a public trust' to be managed and disposed of for one of five purposes," one of which was "for the betterment of the conditions of native Hawaiians." *Rice*, 528 U.S. at 507–08, 120 S. Ct. at 1052, 145 L. Ed. 2d at 1020.

sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." *Id.* In response to a nonnative Hawaiian citizen's Fifteenth Amendment challenge to the constitutional provision establishing OHA committee voting requirements, the State of Hawaii invoked the *Morton* doctrine, claiming the federal statute's authorization to manage and dispose of the land "for the betterment of native Hawaiians" authorized it to restrict voting for the OHA trustees to native Hawaiians. *Id.* at 518, 120 S. Ct. at 1057, 145 L. Ed. 2d at 1027. After expressing doubt that native Hawaiians possessed a federal trust status similar to that of Indian tribes, the Court held even if a similar trust authority existed and could therefore be delegated to the state, "Congress may not authorize a State to create a voting scheme of this sort." *Id.* at 519, 120 S. Ct. at 1058, 145 L. Ed. 2d at 1027. In concluding the constitutional provision violated the Fifteenth Amendment, the Court stressed *Morton's* requirement that, in order to avoid the label of "racial" legislation, the preference could not be "directed towards a 'racial' group consisting of 'Indians,' but rather only to members of 'federally recognized' tribes." *Id.* at 519–20, 120 S. Ct. at 1058, 145 L. Ed. 2d at 1028.

While we believe the General Assembly intended the expanded definition of "Indian child" to advance the laudatory goal of preservation of Indian tribes, we find the challenged classification bears insufficient relation to the traditional rationale for upholding federal Indian legislation—advancement of tribal self-government—to be considered a "political" classification. Because A.W. and S.W. do not qualify for tribal membership, they do not fall within the "political" class of Indians traditionally regulated by federal statutes. Thus, their classification as "Indian children" under the Iowa ICWA, as "clarified" by resolution #04-26, and the consequences

flowing from that classification, result entirely from their ancestry, which is "a proxy for race."[14]  *Rice*, 528 U.S. at 514, 120 S. Ct. at 1055, 145 L. Ed. 2d at 1025.  Given the limits of Congressional authority to legislate only in favor of members of federally recognized tribes, we conclude the Iowa ICWA's expansion of the definition of "Indian child" to include ethnic Indians not eligible for membership in a federally recognized tribe constitutes a racial classification.

The determination that the Iowa ICWA definition of "Indian child" is a racial classification does not end our analysis.  Classifications based on race are "presumptively invalid and can be upheld only upon an extraordinary justification."  *Sherman v. Pella Corp.*, 576 N.W.2d 312, 317 (Iowa 1998) (internal quotation omitted).  We apply strict scrutiny review to racial classifications:

> whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection. . . . [However, w]hen race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied.

*Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S. Ct. 2325, 2338, 156 L. Ed. 2d 304, 331 (2003) (citations omitted); *Sanchez v. State*, 692 N.W.2d 812, 817 (Iowa 2005).

As a racial classification, the Iowa ICWA definition of "Indian child" cannot survive strict scrutiny because it is not narrowly tailored to further a

---

[14]We note the "child of the tribe's community" clause of section 232.3(6) contains no requirement that the child even be an "ethnic Indian."  Therefore, on its face, section 232.3(6) arguably does not create a racial classification because under this broad definition a tribe could theoretically claim an interest in a child with no Indian blood whatsoever.  Whatever the propriety of such a claim, however, we need not address it because we are presented here with application of the Iowa ICWA to ethnic Indian children *because* they are lineal descendants of a tribal member.  Due to the operation of resolution #04-26, A.W. and S.W. have been classified as Indian children because they possess Indian blood.

compelling government interest. The Iowa ICWA contains a statement of purpose which defines the state's interest as:

> cooperat[ing] fully with Indian tribes and tribal citizens in Iowa in order to ensure that the intent and provisions of the federal Indian Child Welfare Act are enforced. This cooperation includes recognition by the state that Indian tribes have a continuing and compelling governmental interest in an Indian child whether or not the child is in the physical or legal custody of an Indian parent, Indian custodian, or an Indian extended family member at the commencement of a child custody proceeding or the child has resided or domiciled on an Indian reservation. The state is committed to protecting the essential tribal relations and best interest of an Indian child by promoting practices, in accordance with the federal Indian Child Welfare Act and other applicable law, designed to prevent the child's voluntary or involuntary out-of-home placement and, whenever such placement is necessary or ordered, by placing the child, whenever possible, in a foster home, adoptive home, or other type of custodial placement that reflects the unique values of the child's tribal culture and is best able to assist the child in establishing, developing, and maintaining a political, cultural, and social relationship with the child's tribe and tribal community.

Iowa Code § 232B.2. This policy statement exhibits the state's interest in implementing the federal trust authority articulated in the federal ICWA. As discussed above, however, when a state acts pursuant to delegated federal Indian trust authority, it may only legislate within the bounds of the Congressional trust power, and the state's interest is necessarily defined by these federal boundaries. Thus, the only legitimate "interest" the State of Iowa may have extends only to providing benefits to tribal Indians, and not ethnic Indians. *Morton*, 417 U.S. at 554 n.24, 94 S. Ct. at 2484 n.24, 41 L. Ed. 2d at 302–03 n.24.

We believe the state's interest in exercising the federal trust authority to protect "essential tribal relations" is a compelling one; however, the inclusion of ethnic Indian children is not narrowly tailored to achieve this compelling interest, as it extends beyond the federal "political" boundary of

tribal membership. We conclude the federal ICWA definition of "Indian child" represents the boundary of the federal trust authority because it is limited to those children who are members of or are eligible for membership in a federally recognized Indian tribe. 25 U.S.C. § 1903(4); *see also* Renner, *Indian Child Welfare Act and Equal Protection,* 17 Am. Indian L. Rev. at 167–69 n.237 (discussing S. 1976, 100th Cong. 1st Sess. (1987), the failed proposal to expand the federal ICWA definition of "Indian child" to ethnic Indians that was opposed by a former Secretary of the Interior because the proposed measure exhibited "pure racism"). By maintaining this integral link to tribal membership, the federal ICWA is "rationally designed to further Indian self government" because it allows the tribe to protect its interests in those individuals who will perpetuate the next generation of the tribe's existence. *Morton,* 417 U.S. at 555, 94 S. Ct. at 2484, 41 L. Ed. 2d at 302. The Iowa ICWA's failure to maintain that integral link to tribal self government results in an over-inclusive racial classification, and therefore violates equal protection principles. *See* Renner, *Indian Child Welfare Act and Equal Protection,* 17 Am. Indian L. Rev. at 171 (noting the over-inclusive feature of a proposed, but rejected, amendment to the federal ICWA that would have extended the statute's reach beyond "those who genuinely fall within the scope of the federal power over Indian affairs.").

The adverse consequences of the race-based discrimination under section 232B.3(6) for A.W. and S.W. are apparent in this case. A.W. and S.W. have never lived on the Winnebago Reservation. There is no evidence in the record tending to prove the children have had any relationship to the reservation or traditional Winnebago society. Like other non-Indian children, A.W. and S.W. are not eligible for membership in the Winnebago Tribe. Notwithstanding these realities, section 232B.3(6) would permit the

classification of A.W. and S.W. as "Indian children" and permit the Winnebago Tribe to intervene and participate as an interested party in any court proceedings held to determine whether the children's best interests require placement in foster care or termination of their parents' rights. *See* Iowa Code § 232B.5(7)(*c*)(1). As a consequence of the classification of A.W. and S.W. in section 232B.3(6) with Indian children who are either tribal members or eligible for tribal membership, a party instituting juvenile court proceedings for the purposes of placing A.W. and S.W. outside their parents' home or terminating the parental rights of Tina and Anthony will be burdened by substantive and procedural requirements that are not applicable in similar proceedings affecting non-Indian children. *See id.* § 232B.9(1) (detailing placement preferences including those for members of the tribe); *id.* § 232B.10 (requiring in certain instances testimony from an expert witness with specific knowledge of the Indian tribe's family organization and child-rearing practices, culture, and customs); *id.* § 232B.6(6)(*a*) (providing termination of parental rights may be ordered only on proof beyond a reasonable doubt that the continued custody of the child by the child's parent or Indian custodian is likely to result in serious emotional or physical damage to the child). One scholar has starkly suggested the extension of ICWA and its attendant proof requirements to ethnic Indian children harms them because it exposes them "to more abuse or neglect before courts can remove them from their parents." Renner, *Indian Child Welfare Act and Equal Protection*, 17 Am. Indian L. Rev. at 172.

Section 232B.3(6) expands the definition of "Indian child" far beyond its federal ICWA counterpart. By including children who are ineligible for tribal membership, section 232B.3(6) clearly exceeds the limits of federal power over Indian affairs upon which the federal ICWA is based and from

which the Iowa ICWA is derived. In its classification of ethnic Indian children with tribal Indian children, section 232B.3(6) provides "hardly more than a pretense that this classification is political, rather than racial." Renner, *Indian Child Welfare Act and Equal Protection*, 17 Am. Indian L. Rev. at 169. We conclude the race-based classification of A.W. and S.W. as "Indian children" is not justified by a compelling state interest. Accordingly, section 232B.3(6), as applied in this case to A.W. and S.W., violates the Equal Protection Clause of the United States Constitution. As a separate and independent ground for our decision, and in the exercise of our "exclusive prerogative . . . to determine the constitutionality of Iowa statutes challenged under our own constitution," *Callender*, 591 N.W.2d at 187, we further conclude section 232B.3(6), as applied in this case, violates the equality provision in article I, section 6 of the Iowa Constitution.

Having concluded section 232B.3(6) is unconstitutional on equal protection grounds as applied to A.W. and S.W., we need not address the other claims raised by the guardian ad litem.

## IV. Conclusion.

Because A.W. and S.W. are ethnic Indian children who are ineligible for membership in the federally recognized Winnebago Tribe, the State of Iowa may not constitutionally subject them to the provisions of the Iowa or federal ICWA. Accordingly, we reverse the juvenile court's order granting the Winnebago Tribe's motion to intervene.

**REVERSED AND REMANDED.**