# IN THE COURT OF APPEALS OF IOWA

No. 16-0795
Filed August 17, 2016

**IN THE INTEREST OF K.M.,**
**Minor child,**

**K.M., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Jasper County, Steven J.

Holwerda, District Associate Judge.


        A mother appeals the termination of her parental rights to her child.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**


        Nicholas A. Bailey of Bailey Law Firm, P.L.L.C., Altoona, for appellant

mother.

        Thomas J. Miller, Attorney General, and Kathrine S. Miller-Todd, Assistant

Attorney General, for appellee State.

        Meegan M. Langmaid-Keller of Keller Law Office, P.C., Altoona, for minor

child.


        Considered by Vogel, P.J., and Doyle and Bower, JJ.

**DOYLE, Judge.**

A mother appeals the termination of her parental rights to her child.[1]  She argues the juvenile court violated her due process rights by the manner in which it conducted the permanency and termination hearings.  She also argues she was not provided with reasonable efforts toward reunification, and she challenges the denial of her request for a six-month extension.  Because we find the child's best interests are served by delaying permanency for six months rather than by terminating the mother's parental rights, we reverse the termination order and remand for further proceedings.

### I.  *Background Facts and Proceedings.*

The mother, who was twenty years old at the time of the termination-of-parental-rights hearing, began using methamphetamine when she was fourteen years old.  In 2010, she entered a ninety-day substance-abuse-treatment program, but she was released after just three weeks.  Due to her ongoing substance-abuse issues, she was adjudicated a child in need of assistance (CINA).  The mother was able to abstain from using methamphetamine while in various placements with the Iowa Department of Human Services (DHS), but she relapsed when she left those placements.

The mother was charged with various drug-related crimes based on events that occurred in August and September 2013.  In August 2014, shortly after giving birth to the child at issue, the mother pled guilty in two separate cases to a four crimes—possession of methamphetamine with intent to deliver, possession of marijuana, introducing a controlled substance into a detention

---

[1] The father's parental rights were also terminated.  He is not a party to this appeal.

facility, and possession of hydrocodone. The court sentenced her to a term of not more than ten years on the possession charge. The mother also received a combined prison term of not more than six years in prison on the remaining charges. The court suspended the sentences, and the mother was placed on probation.

During the first several months of the child's life, the mother maintained her sobriety. Unfortunately, her sobriety did not last, and she relapsed by the end of 2014. The mother reported that by January 2015, she was using methamphetamine daily and marijuana occasionally.

The DHS became involved with the family in March 2015 due to the mother's methamphetamine use. The child tested positive for exposure to methamphetamine, and the juvenile court removed the child from the home and placed the child with the paternal grandmother. The child remained in that placement throughout these proceedings, and the paternal grandmother voiced her willingness to adopt the child, if necessary.

In March and April of 2015, the mother continued to use methamphetamine. During this period, the mother was somewhat compliant with services. She obtained a substance-abuse evaluation as required, which recommended inpatient treatment, but a bed was reportedly unavailable. The mother provided appropriate care for the child and met the child's needs during visits, though she was frequently late and canceled several visits.

After the mother violated the terms of her probation, the State issued a warrant for her arrest in April 2015. In order to avoid arrest, she did not visit the

child from April 27 until May 7. However, on May 7, she presented herself for arrest at the DHS office after receiving one last visit with the child.

The mother admitted to violating the terms of her parole and was transferred to the Iowa Correctional Institution for Women (correctional facility) in Mitchellville to serve her remaining sentence. Around the same time, the mother stipulated to the basis for a CINA adjudication, and the juvenile court adjudicated the child to be a CINA. The DHS did not permit the child to visit the mother at the correctional facility.

On September 10, 2015, the mother moved the juvenile court to order the DHS to provide visitation during her incarceration. On the same day, she also moved to testify by telephone at the permanency hearing. The court denied her request to testify by telephone but allowed the parties to depose the mother and offer her deposition in lieu of live testimony.

In December 2015, the juvenile court entered its permanency order. The court determined permanency should not be delayed and ordered the State to initiate termination-of-parental-rights proceedings. It also declined the mother's request for visitation with the child at the correctional facility, reasoning:

> The mother had the opportunity to visit with the child at the beginning of the case and before she went to prison. Yet her visits were "very inconsistent," and she missed several weeks of visits because she was avoiding an outstanding warrant for her arrest. The mother did not take advantage of her opportunities to visit with her child. Now she is in prison. The court does not believe that prison visits are in the best interests of the child, given the child's age, the location of the visits, and the lack of visits since May 7.[2]

---

[2] The lack of visits was a direct result of the DHS's denial of visitation.

The State filed a petition to terminate the mother's parental rights in January 2016. The mother moved for—and was granted—"the opportunity to participate by phone and present evidence, including her own." At the April 2016 hearing, the mother's counsel asked the court to continue the hearing, noting both the State and the guardian ad litem objected to the mother providing testimony by telephone. Her attorney also noted that the mother had not been able to review the State's exhibits and that the mother's anticipated date of parole was approximately two weeks later. The court verified its order allowing the mother to testify by telephone but denied a continuance, noting most of the State's exhibits had been introduced at prior hearings. It also declined to continue the hearing based on the mother's possible parole in the near future. When the mother's attorney asked whether the mother could remain on the telephone during the testimony of other witnesses, the court stated she could only be present by telephone to give testimony.

The mother testified that she intended to live with her uncle in Des Moines following her release from the correctional facility. She also planned to receive outpatient treatment from a House of Mercy counselor with whom she remained in contact while incarcerated. She testified she had two jobs lined up following her release and both jobs would be available to her immediately upon release. The mother explained why she believed she would be successful this time:

> I'm going to a different community. There's more opportunity in the city that I'm going to. I have two jobs lined up for me already. I plan to go right back to school when I get out. In terms of my keeping a part-time job, I have transportation, and the house that I'm going to, there's no drug use. Well, I mean, the houses I've been to before, there's no drug use either, but I don't know anybody in the community.

The mother admitted she was unable to resume care for the child at that time but requested six additional months to prove herself. In the alternative, the mother asked that the court appoint the maternal grandmother as the child's guardian in lieu of terminating her parental rights.

On April 29, 2016, the juvenile court entered its order terminating the mother's parental rights. The court found the State proved the grounds for termination pursuant to Iowa Code section 232.116(1)(d) (child adjudicated CINA and circumstances leading to the adjudication continue to exist despite receipt of services), (h) (child three years old or under, adjudicated CINA, removed from the parent's care for six months, and cannot be returned at the present time), and (*l*) (child adjudicated CINA and placed out of home, parent has a severe substance-related disorder presenting a danger to self or others, and child cannot be returned within a reasonable time) (2015). The court found termination was in the child's best interests, noting that the child had been out of the mother's care for over a year and that the mother's substance-abuse issues would prevent her from resuming care of the child in the foreseeable future. It determined an extension of time was not appropriate based on the mother's past inability to remain sober. It also found there was no evidence the maternal grandmother would be willing to be the child's guardian or that a guardianship would be in the child's best interests. Finally, the court declined to apply any of the statutory exceptions to termination.

The mother now appeals. Our review is de novo. *See In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016); *see also In re A.W.*, 741 N.W.2d 793, 806 (Iowa

2007) ("We exercise de novo review of constitutional claims."). "As always, our fundamental concern is the child's best interests." *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014).

### II. Due Process Claim.

The mother first claims the juvenile court infringed on her due process rights when it denied her request to testify by telephone at the permanency hearing. Bound by precedent, we are obligated to conclude the mother received due process by presenting deposition testimony at the permanency hearing. *See In re J.S.*, 470 N.W.2d 48, 52 (Iowa Ct. App. 1991) (holding the presentation of testimony by deposition is sufficient to meet due process requirements).

The mother also claims the court denied her due process by prohibiting her from remaining on the telephone during the entire termination hearing. The State counters that the mother failed to preserve error because although she requested permission to testify telephonically, she never asked to attend the termination proceedings in their entirety or registered an objection when the court ruled she would only remain on the telephone for her testimony. *See In re A.M.*, 856 N.W.2d 365, 371 n.5 (Iowa 2014) (declining to reach a constitutional claim that was not raised before the district court); *see also In re J.G.*, No. 15-1755, 2016 WL 363747, at *1 (Iowa Ct. App. Jan. 27, 2016).

Assuming the mother preserved error, this claim fails. The mother received notice of the termination proceedings. She was not present at the hearing, but she presented testimony by telephone. She was also represented by counsel who was present at the termination hearing. This is good enough under our precedent. *See J.S.*, 470 N.W.2d at 52 (holding a parent is afforded

due process during termination proceedings if given notice of the proceedings, represented by counsel who is present at the proceedings, and afforded the opportunity to present testimony—by deposition).[3]

Just because the process employed here was good enough does not make it right. We note that the due process requirements outlined in our prior cases are a floor, not a ceiling. Although the court was not required to permit the mother to remain on the telephone during the proceedings, we see ample reasons why an incarcerated parent should be permitted to do so. If a witness is providing untruthful or biased testimony about an interaction with the parent, it is the parent who is in the best position to recognize it. Hearing the evidence as it comes in—either in person or telephonically—provides a parent with the opportunity to confer with counsel and potentially offer points of rebuttal to that evidence.

We see no reason for the denial of the mother's participation in the termination hearing—nor was any articulated by the court. Certainly, the court must be allowed to run its own courtroom as it sees fit, and if the mother was disruptive during the proceedings, the court could have denied her continued participation. But where the mother was ordered to pay for the cost of her participation and no reason was shown to preclude her participation in the entire

---

[3] *See also J.G.*, 2016 WL 363747, at *1; *In re N.H.*, No. 15-0691, 2015 WL 5577069, at *2-3 (Iowa Ct. App. Sept. 23, 2015); *In re N.W.*, No. 12-1233, 2012 WL 3860661, at *1 (Iowa Ct. App. Sept. 6, 2012); *In re A.S.*, No. 11-1325, 2012 WL 170705, at *1 (Iowa Ct. App. Jan. 19, 2012); *In re K.B.*, No. 09-1397, 2009 WL 4111206, at *3-4 (Iowa Ct. App. Nov. 25, 2009); *In re M.B.*, No. 09-0409, 2009 WL 1913699, at *2 (Iowa Ct. App. July 2, 2009).

hearing, the better practice would have been to allow it.[4]  Just because a parent's participation is not constitutionally required does not mean it should be denied without reason.

### III. Reasonable Efforts.

The mother next argues the DHS failed to make reasonable efforts toward reunification, arguing the DHS should have provided visitation between her and the child at the correctional facility.  We agree.

Iowa law requires the DHS to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child."  Iowa Code § 232.102(7); *see also C.B.*, 611 N.W.2d at 493.  As defined in the statute, "'reasonable efforts' means the efforts made to . . . make it possible for the child to safely return to the family's home."  Iowa Code § 232.102(10)(a).  "In determining whether reasonable efforts have been made, the court shall consider . . . [t]he type, duration, and intensity of services or support offered or provided to the child and the child's family."  *Id.* § 232.102(10)(a)(1).

"Visitation between a parent and child is an important ingredient to the goal of reunification."  *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996).  Therefore, the concept of reasonable efforts includes "a visitation arrangement designed to facilitate reunification while protecting the child from the harm responsible for the removal."  *Id.*; *see also C.B.*, 611 N.W.2d at 493.  Although a parent's incarceration may create difficulties in providing reunification services, it

---

[4] *See N.W.*, 2012 WL 3860661, at *1 n.1 ("The better practice, however, would be to allow parental participation when requested and feasible.").

does not absolve the DHS of its duty to provide them in all circumstances. *See In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000). Rather, the DHS must determine what would be reasonable based on the circumstances of the individual case. *See id.* In determining what services are reasonable for an incarcerated parent, our court has articulated that the DHS may consider

> some or all of the following factors, among others, if applicable: the age of the children, the bonding the children have or do not have with their parent, including any existing clinical or other recommendations concerning visitation, the nature of parenting deficiencies, the physical location of the child and the parent, the limitations of the place of confinement, the services available in the prison setting, the nature of the offense, and the length of the parent's sentence.

*Id.* Notably, the DHS "has an obligation to make a record concerning its consideration of this issue." *Id.*

Here, the DHS refused to authorize visitation between the mother and the child following the mother's incarceration at the correctional facility, effectively barring the mother from seeing her child for a year. Jessica Marks, the DHS social worker initially assigned to this case, testified at the termination hearing that, although the mother requested visitation at the correctional facility and the paternal grandmother was willing to take the child there for visits, the DHS determined visitation was not appropriate. When asked what specific harms she could point to at the correctional facility that would make visitation contrary to the child's best interests, Marks stated that she had discussed the matter with her supervisor and the guardian ad litem, and they decided that—although the child is attached to the mother—it would not be in the child's best interests for visits to go on in a prison setting due to the child's age. Marks admitted she was unable

to think of any concerns regarding the child's safety that stemmed from visitations at the correctional facility. The mother's attorney then inquired specifically about the area of the facility provided for visitation:

> Q. Is it fair to say that it's—it's kind of laid out where there's tables, and there's an area for kids to play and books and those sorts of things; correct? A. Yes.
> Q. So that setting is set up for visitation of young children whose parents are incarcerated. Would you say that's fair? A. Yes.

Marks testified that prior to the mother's incarceration, visits were conducted at the paternal grandmother's home and in community areas like parks. Marks agreed that a visit at the correctional facility would be a "drastic change" for the child.

Sean Bowes was the DHS social worker assigned to the case after Marks, and his first contact with the family occurred in September 2015. Bowes provided the following testimony at the October 1, 2015 permanency hearing concerning visitation:

> Q. Would you agree with me that they're in a visitation room in the prison, there would be a lot of supervision, a lot of people there? A. Yes. There would be a lot of people in the visitation room in the prison, I believe.
> Q. Are there any safety concerns that you can name with a visitation taking place in a—in the visitation room at [the correctional facility]? A. I personally don't know of any visits that have ever taken place there, so I don't know. I would say that it would be a safe place.

At the termination hearing, Bowes testified that on November 6, 2015, the mother asked that he review her having a chance to have visits at the facility. He told the mother he would "staff" the request with his supervisor. However, because the juvenile court addressed the issue in its December 2015 permanency order

and found visitation was not in the child's best interests, "it was not pursued."

Bowes further testified as follows:

> Q. [I]s the [DHS's] position usually to offer prison visitation? A. It's a case-by-case basis. I can't tell you for sure.
> Q. Have you ever been to the visitation facilities at the [correctional facility]? A. I have not.
> Q. So you're not aware of how that's laid out or whether this would— A. No.
> Q.—there would be any imminent harm to the child going to the visitation at the [correctional facility]? A. I haven't seen it.

At the termination hearing, the mother provided a description of the prison's visitation facilities:

> Q. [T]ell us about the visitation facilities at [the correctional facility]. A. Well, they're kid friendly. There is a kid area. It's carpeted. There's a guard present at all times. Other families get their kids brought [to the correctional facility], all different ages.
> Q. Other families that are—that you know to be involved in the CINA system in Jasper County; correct? A. Yes.
> Q. Do you believe that there would be any imminent harm to [the child] were she to go visit you at the [correctional facility]? A. No.

Iowa Code section 232.107 states that "unless the court finds that substantial evidence exists to believe that reasonable visitation or supervised visitation would cause an imminent risk to the child's life or health, the order shall allow the child's parent reasonable visitation or supervised visitation with the child." The juvenile court denied the mother's request for visitation but made no such finding. The juvenile court instead held visitation at the correctional facility was contrary to the child's best interests "given the child's age, the location of the visits, and the lack of visits since May 7." The child's age alone does not justify denying visitation. The court also justified denial of visitation in prison by noting the mother "did not take advantage of her opportunities to visit with her child"

prior to her incarceration because she did not attend all visits as scheduled during the two months between the time the child was removed from her care and her arrest. The mother's failure to attend every scheduled visit during that two-month period—a time during which the mother admits she was using methamphetamine—does not justify the denial of all visitation while the mother is incarcerated.

The record before us is utterly devoid of any evidence that visitation in the correctional-facility setting would create an imminent risk to the child's life or health or be otherwise detrimental to the child. Neither of the DHS workers who testified could identify a danger that visitation would present to the child. The only reason provided by the DHS for denying visitation was the child's young age, which, in our eyes, is a vague and wholly insufficient justification for denying visitation. It is inconceivable that this one-year-old child would have had any awareness that she was in a prison setting, particularly the family visitation area at this correctional facility. If anything, the denial of visitation during the mother's incarceration was harmful to the child, given the evidence of the bond between the mother and the child. The denial of visitation between the mother and the child was therefore unreasonable, constituting a failure to make the required reasonable efforts. *See In re K.L.P.*, No. 15-1371, 2015 WL 6507840, at *4-5 (Iowa Ct. App. Oct. 28, 2015).

### *IV. Additional Time.*

The mother contends the juvenile court should have granted her an additional six months to attempt reunification. We agree.

In denying the mother's request for a six month extension, the juvenile court stated:

> The mother also has not progressed beyond supervised visits and has not seen her child for 11 months, in part because she is in prison. The mother has requested visits in prison but she, by her own actions, effectively removed herself from her child's life. The mother is still in prison. Even when she is paroled, by her own testimony, her longest period of sobriety has been five months. The Court cannot pre-suppose the mother's success in six months, especially given her history to the contrary.

The record shows the mother is a good parent and able to meet the child's needs when she is sober.[5] The issue is the mother's ability to maintain sobriety after her release from the correctional facility, which appeared to be imminent at the time of the termination-of-parental-rights hearing. The juvenile court articulated its dilemma in deciding whether "the forced sobriety of prison truly translates into a determination that the circumstances no longer exist or will no longer exist once the mother is paroled into the challenges and temptations of the world outside the confines of prison," noting that such determinations "cannot be made in a vacuum and cannot be made until the mother shows that she can successfully face the challenges when left to her own devices." Although the mother has not had the opportunity to show she can successfully face those challenges, the court ultimately concluded that the mother's past inability to show that she could maintain sobriety as either a juvenile or adult was determinative. The State agrees, citing the mother's history with the juvenile court as a CINA.

---

[5] Marks testified that although the mother was late to or missed visits with the child, "[w]hen she was there, she is a great parent to [the child], and she would meet [the child's] needs during that visit time."

We are aware that a parent's past performance may be indicative of the future quality of care that parent is capable of providing. *See In re T.B.,* 604 N.W.2d 660, 662 (Iowa 2000). However, there are important distinctions between the mother's past behavior and her current status. During the mother's prior involvement with the DHS, she was a juvenile; she is now an adult. The mother was previously a CINA; she has now served a prison sentence for a felony conviction. The most significant difference is that the mother is now a parent and has experienced what her life is like when she has been able to fulfill her parental role and when she has not. At the hearing, she testified as to why this factor has motivated her to make a change for the better:

> Q. Why is this time different? A. Um, I mean, there just comes a time when you're ready . . . . I've been able to see [the child]. I haven't—I haven't been able to raise her. I missed her first step, her first birthday, you know.
> Q. Are you—so you're saying that those missed moments are an additional item that makes you want to be sober? A. Yes.
> Q. Are you trying to break the cycle of continued drug use? A. Yes, I am. I'm twenty years old, and by now, I should have credit and a good job and a good career, and I don't have nothing to show for it, anything that I've done.
> Q. Because of your drug use? A. Yes.

It is also important to note the mother's voluntary participation in the classes and programs offered to her through the Iowa Department of Corrections (DOC) while in prison. She received certificates for completing several twelve-week courses—entitled "Co-Dependent Anonymous," "Woman's Way Through the 12 Steps," and "Winners Circle"—in addition to receiving certificates for completing a finance class and a life-skills class. As this court has previously observed, "[I]t seems we should proceed on the assumption that the [DOC] provides services to incarcerated persons for the purpose of rehabilitation and

behavior modification." *K.L.P.*, 2015 WL 6507840, at *6. And, unless shown otherwise, we should assume these services do indeed rehabilitate participants.

The mother acknowledges that she needs to prove she can maintain her sobriety for her child, and to that end, she asked for six additional months to attempt reunification. In order to defer permanency for six months, the court must "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). Deferring permanency for six months would allow the mother to show whether she is able to maintain her sobriety.

We recognize that in termination proceedings, time is typically "a critical element." *C.B.*, 611 N.W.2d at 495. The legislature has established the amount of time the court must afford a parent before entertaining the termination of parental rights, *see* Iowa Code § 232.116(1), and we view termination proceedings with a sense of urgency once that time period has passed, *see C.B.*, 611 N.W.2d at 495. However, "[t]ermination must only occur where more harm is likely to befall the child by staying with his or her parents than by being permanently separated from them." *In re H.H.*, 528 N.W.2d 675, 677 (Iowa Ct. App. 1995). We cannot yet say this is the case here. Weighing the mother's participation in the DOC programs, her expected release from the correctional facility less than two weeks after the hearing, and the changes she planned to implement upon her release against the unknown—her ability to successfully abstain from using narcotics in order to provide safe and appropriate care for her

child—we agree the mother should have been allowed an additional six months to prove she has made the necessary changes to reunite with the child.

A good deal of prognostication is required in termination cases. While this court remains optimistic that the mother will hold true to her promise to make the changes necessary to reunite her with the child, we acknowledge that there are no guarantees of success. It is important to note, however, that under the circumstances of this particular case, delaying permanency for six additional months will not result in any additional harm to the child. Here, the child was placed with the paternal grandmother after removal from the mother, has remained in the paternal grandmother's care throughout the pendency of the proceedings, and will likely be adopted by the paternal grandmother if the mother's paternal rights are terminated. The child's life will not change by continuing that placement for six more months. If the mother is not successful in her bid to resume parenting of the child, the juvenile court can terminate her parental rights and the adoption may still occur. However, if the mother is successful, the statutory goal of preserving the family unit without further danger to the child will be achieved. *See* Iowa Code § 232.67. Only one thing is certain: the mother will either succeed or fail in overcoming her addiction. Whatever the outcome, it will occur regardless of whether her parental rights are terminated today, at some future date, or remain intact. However, in the event that she succeeds, we prefer that the mother does so with her parental rights intact.

After weighing the importance of the mother's right to raise her child, *see In re P.L.*, 778 N.W.2d 33, 38 ("A parent's right to raise his or her child is an

important interest warranting deference and, absent a powerful countervailing interest, requires protection.") (2010), the permanent nature of terminating that right, *H.H.*, 528 N.W.2d at 677 ("Termination is a drastic, final step which improvidently employed can be fraught with danger."), and the lack of harm or interruption in the child's life caused by delaying permanency, we find—on this record—the child's best interests require that we delay permanency for a six-month period. Accordingly, we reverse the order terminating the mother's parental rights to her child and remand for further proceedings.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

Bower, J., concurs; Vogel, P.J., partially dissents.

**VOGEL, Presiding Judge. (concurring in part and dissenting in part)**

While I agree there was no due process violation and visitations should have been permitted in the prison, I would affirm the district court's termination order. The denial of prison visitation would have had no impact on the termination of the mother's parental rights under Iowa Code section 232.116(1)(h) (2015). Paragraph (h) provides the court may terminate the parental rights to a child if:

> h. The court finds that all of the following have occurred:
> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The record clearly establishes K.M. was three years old or younger, she was adjudicated a child in need of assistance, she was removed from the mother's care for at least six months—in this case, over twelve months—and she could not be returned at the time of the termination hearing because the mother was incarcerated. Whether prison visitation had been provided does not affect these elements. While the district court also found grounds to terminate under paragraphs (d) and (*l*), we need only find the evidence supports one of the alleged grounds in order to affirm the termination. *See In re J.B.L.*, 844 N.W.2d 703, 704 (Iowa Ct. App. 2014) ("[W]e need only find termination appropriate under one of these sections to affirm.").

I also disagree with the majority that the court should have granted the mother an additional six months to work toward reunification because there was no likelihood the mother would have been in a position to resume care of the child within that time period. The mother was incarcerated at the time of the termination hearing. It was anticipated she would be paroled in two weeks, but there was no evidence the mother had made progress on addressing her long-lasting substance-abuse problems. While she had been sober since May of 2015, the reason for the sobriety was her incarceration, and as the district court found, the mother has proven time and again that when she is in society she cannot control her addiction. She admitted in her testimony that the longest time she has ever been sober when she was on her own in the community was five months, which was when she was pregnant with K.M. and continuing until a few months after K.M.'s birth.

The district court noted:

> She has completed substance abuse programming and has been clean for [eleven] months. One would be inclined to believe that the circumstances that led to the adjudication no longer exist for her. However, her successes have been accomplished in the closed and unnatural environment of prison. When left to her own devices at the beginning of the case, the circumstances that led to the adjudication continued to exist right up to the day she went to jail. Even with a new child, the removal of the child and the involvement of the DHS, the prospect of termination of parental rights, criminal charges, probation, and the prospect of prison, the mother continued to use illegal drugs, hang out with known drug users, and be involved in criminal activity. In fact, the date of her sobriety is May 7, 2015, the day she went to jail. Outside of prison, she could do no right and, by her own admission, her longest period of sobriety was five months. Even as a juvenile, she was successful in structured placements but failed on her own. The pattern repeats itself, and the court is left to decide if the forced sobriety of prison truly translates into a determination that the circumstances no longer exist or will no longer exist once the

> mother is paroled into the challenges and temptations of the world outside the confines of prison. Such a determination cannot be made until the mother shows that she can successfully face the challenges when left to her own devices. She has yet to show that she can, either as a juvenile or as an adult.
>
> . . . .
>
> . . . Even when she is paroled, by her own testimony, her longest period of sobriety has been five months. The court cannot presuppose the mother's success in six months, especially given her history to the contrary.

I agree with the district court's assessment. When she was pregnant with K.M. and facing criminal charges, she told the district court she was ready to "change her ways." In the termination proceeding, the court found her renewed assertion of changing her ways lacked any promise of success. Considering the extent and severity of her substance abuse addiction, the mother would not have been in a position to resume caring for the child in six months, even assuming she was released from prison two weeks after the termination hearing, as was anticipated. *See* Iowa Code § 232.104(2)(b) (noting the court can enter an order continuing placement "for an additional six months" but the order must provide "the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six month period"); *In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) ("Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" (citations omitted)).

I would affirm the order terminating the mother's parental rights.