# IN THE SUPREME COURT OF IOWA

No. 20–1371

Submitted February 17, 2021—Filed March 12, 2021

**IN THE INTEREST OF C.Z.,** Minor Child.

**N.C.,** Father, and **STATE OF IOWA,**

Appellants.

Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.

Father appeals an order terminating his parental rights to his daughter. **REVERSED.**

Waterman, J., delivered the opinion of the court, in which Christensen, C.J., Mansfield, Oxley, and McDermott, JJ., joined. McDonald, J., filed an opinion concurring in part and dissenting in part, in which Appel, J., joined.

Adam Hanson of Law Office of Adam Hanson, Des Moines, for appellant father.

Thomas J. Miller, Attorney General, and Charles K. Phillips, Assistant Attorney General, for appellant State of Iowa.

Erin Mayfield of Youth Law Center, Des Moines, guardian ad litem for minor child.

Christine E. Branstad and Teresa M. Pope of Branstad & Olson Law Office, Des Moines, for intervenor appellees.

Lily E. Dayton, Assistant Polk County Attorney, for the Polk County Attorney's Office, Des Moines.

**WATERMAN, Justice.**

The Iowa Department of Human Services (DHS) represented by the attorney general and the father appeal the juvenile court order terminating the father's parental rights to his two-year-old daughter. DHS, the attorney general, and the father all favor restoring the father's rights and placing his daughter in his custody under supervision. Termination is supported by the Polk County Attorney, the foster parents, and the child's guardian ad litem (GAL). This unusual alignment of parties presents a threshold issue: whether the county attorney may be heard in this appeal. Normally, the State is represented by the county attorney in juvenile court and by the attorney general on appeal. Here the county attorney is adverse to the State and has no client in this case. But in a 2013 amendment to the statute applicable to terminations, the legislature provided that when the county attorney and State (represented by the attorney general) disagree, "the county attorney may continue to appear *in the proceeding* and may present the position of the county attorney regarding the appropriate action to be taken in the case." Iowa Code § 232.114(3) (2014) (emphasis added). Today we hold that "the proceeding" includes the appeal from the order terminating parental rights.

On our de novo review, for the reasons explained below, we reverse the order terminating the father's parental rights.

## I. Background Facts and Proceedings.

C.Z. was born in November 2018. Three days after her birth, the juvenile court ordered C.Z. to be immediately removed from the custody of her mother due to the mother's homelessness, substance abuse concerns, and failure to demonstrate parenting capability. The court found C.Z. could not be placed with her father at that time due to his history of domestic abuse, substance abuse concerns, and his inability to show

appropriate parenting. C.Z.'s mother and father were unmarried but were involved in a prior relationship and the court had terminated their parental rights to their son, M.C., five months before C.Z.'s birth.

On November 30, the court placed temporary legal custody of C.Z. with DHS. On December 18, C.Z. was adjudicated a child in need of assistance (CINA). The father's paternity was established in January 2019. C.Z. was placed with foster parents who later were allowed to intervene in this case.

The father admitted to substance abuse. He was prescribed suboxone strips from Covert Action, a clinic where he received counseling. He sought treatment after his rights to M.C. were terminated because he was struggling with depression and wanted to prevent a relapse. There were discrepancies in what he said about his drug use. He told DHS he had last used marijuana in January 2019; he told Covert Action that he last used in October 2018. He also disclosed to DHS a car accident in September 2018 but said that there were no illegal substances or alcohol found in his system. The police report stated the father admitted to having consumed alcohol the day of the accident and the hospital blood test revealed opiates and benzodiazepines. He also failed to disclose that he had been diagnosed with alcohol abuse.

In March 2019, the father tested positive for methamphetamines and amphetamines. On May 20, the court confirmed C.Z. was a CINA and ordered the temporary legal custody of C.Z. remain with DHS for foster care. The next day, the court scheduled a termination of parental rights hearing. On October 25, the court terminated the mother's parental rights.

In its October 28 report, DHS noted that the father had reportedly been seen intoxicated downtown, and that while the father denied being

intoxicated, he admitted to drinking "on occasion while watching football." DHS noted that the father admitted to missing about five weeks of therapy due to a new job, but that he had resumed therapy in September. The father was asked about ending some visits with C.Z. early to go watch football; the father denied this happened more than once.

On November 6, the court granted the father a six-month extension, prohibited him from going to bars, and ordered C.Z. to remain in DHS custody. The father was "visibly upset" at this hearing, and challenged the court's order to stay away from bars; he argued Grumpy Goat was not a bar, and the court then specifically ordered him not to go to Grumpy Goat. The father later violated this order by going to a bar, Mac Shack, in November 2019 and Grumpy Goat in January 2020. When confronted with violating the court order, he "admitted to being in both locations, d[rinking] two beers, and admitted that it was a 'stupid mistake.' "

In late November 2019, the father began having four overnight visits a week. These continued for about thirty days; the father transported C.Z. to and from daycare, handled her medical appointments, and took care of her daily needs. Family, Safety, Risk, and Permanency services (FSRP) noted there were no concerns raised by FSRP, DHS, the daycare, the Court Appointed Special Advocate (CASA), or Early Access during that time. The father continued working at the workplace where he had been employed since August and continued working through the duration of the case. He had stable, appropriate housing in the same apartment complex as his father, who lived in the building next door, supported the father, and "established a relationship with [C.Z.]."

On December 31, the county attorney, on behalf of the State, filed a motion to return C.Z. to her father's custody. At that time, C.Z. had been with the father for a consecutive week. DHS had C.Z. continue to stay at

the father's home from December 31 to January 30, 2020; no concerns were raised during this time by Early Access, DHS, or FSRP.

While the relationship between the father and the foster parents initially was supportive, it began to deteriorate in the autumn of 2019. On December 23, the foster parents filed a motion to intervene. On January 15, 2020, the foster parents' motion to intervene was set for a hearing. An Assistant Polk County Attorney reported that he had seen the father at Grumpy Goat on January 12. A photo from the father's Facebook account was downloaded as an exhibit; it showed alcoholic beverages inside of a refrigerator with the caption "Life is Good." The hearing was reset for January 30. The State, GAL, and father resisted the request to intervene. At the hearing, the foster parents told the court that C.Z. had been with the father for an extended home visit. During the hearing, the court told the parties that C.Z. needed to be returned to foster care. On February 8, the court issued its order granting the foster parents' motion to intervene. It found that DHS's return of C.Z. to her father's custody violated the court's prior ruling.

On February 7, the father set up a video phone call with the mother who was in jail. He knew the call would be recorded. The father called the judge names and voiced his frustration with the case and his child not being in his care. He told the mother it was "[t]he same judge from the last one." He explained that "everybody's on my side," listing DHS, the county attorney, the GAL, CASA, and Early Access. He said on December 24 "[C.Z.] came home for good," that "she was at my house full time," but after a month, the foster parents filed a motion to intervene. He mentioned the county attorney informing the court that he had seen the father at Grumpy Goat, and was upset that he could be in contempt of court for going. He told the mother:

> I swear to God. This – she is not right. This Judge. She's being prejudice. She's like building up shit from last case. I - like she – she's fucked up. Even DHS said like this is messed up. I've never seen this happen and they've ask for like an explanation and they – the Judge like filed motion I don't have to explain nothin. Like she's just being bad. So . . . . we go to court about this intervening and she knows this in the back her head and she grants access for the foster family to intervene in the case, first of all.

The father failed to tell DHS about this call, and several phone calls he had with the mother between February 8 and 11. The State told the court about this contact during an emergency hearing on February 14. DHS viewed his undisclosed jail phone calls as concerning, but ultimately pointed out that to his credit he told the mother that "she needs to change her life, make different choices, point[ed] out the difference in their lifestyles, and [was] frustrated by her continued addict mentality."

On February 29, DHS reported actions of the foster mother it found concerning, including that she shadowed the father to take photos of him in a bar on two occasions, sent the photos to caseworkers, "attempted to sabotage [the father's] visits," and breached confidentiality.

Because of COVID-19, there were approximately three weeks in April where the father had no visits with C.Z. He declined virtual visitation because of the breakdown in the relationship with the foster parents and his belief that interacting with C.Z. by video would be difficult. DHS denied the father's request that in-person visits continue. The father relapsed on April 20 by taking cocaine. In-person visits resumed on April 21. On April 23, DHS asked for a drug test, which is when the father told them of his relapse. He refused to do a drug test, later claiming it would be expensive and unnecessary because he had already told them he had used cocaine. Because of this relapse, DHS recommended that the father's parental rights be terminated. The GAL agreed. DHS formally changed its position on July 22 to recommend dismissal of the termination petition.

DHS noted the father's ability to "articulate his triggers, his struggles, what he should have done differently, who his positive supports are and he has built a safety plan regarding his triggers moving forward."

Meanwhile, the father had been attending sessions with Early Access. While their last in-person session was in March, Lori Rogerson, the Early Access social worker who had worked with the father for more than a year, communicated with the father several times in April. In a June 17 report, Rogerson noted the father had a "good routine" for meal time, that he "asked good questions" about food safety, and that he had "found appropriate daycare."

On July 23, the father's drug screen had a temperature outside the appropriate range. Ordinarily, according to the DHS supervisor, Jessica O'Brien, this would constitute a tampered drug screen. O'Brien noted the father had been tested since July 23 and those tests had been "negative without issue."

In a July 28 report, a few days before the termination hearing began, the CASA recommended the case continue under DHS supervision and the father comply with all requirements in the case plan and court orders. She said "[r]egardless of the outcome going forward, [C.Z.] needs to have ongoing and consistent contact with her father and grandfather. These are significant and connected adults in her life." Throughout the case, the CASA repeatedly noted the father's intentionality and care for C.Z.

The termination hearing spanned three days in August. Three DHS workers, the FSRP worker, the Early Access social worker, and the father's therapist all testified that the father could be a good parent. Several witnesses were surprised to learn of his drinking alcohol at the time of his drug relapse and postrelapse drinking. DHS officially recommended that C.Z. be returned to her father's care.

During the hearing, the father admitted to drinking a couple of beers after his relapse, but said that for the previous few months, he had abstained completely from alcohol. He falsely testified he had never been diagnosed with alcohol abuse.

Ryan McClure, the fathers' therapist since June 2019, testified that he "believe[d] [the father] does have it within him to be a good parent and to be a safe parent." He noted this was contingent on the father's continued sobriety, which he believed he had maintained since his relapse. When confronted with the father's testimony that he had consumed alcohol after the relapse, McClure said that would change his opinion and that was something they had not talked about.

Casey Gill began working as a DHS social worker on the case in November 2019. She testified that they discussed the risk of drinking alcohol while taking suboxone and acknowledged that the father used alcohol throughout the case. Gill emphasized the father as being "fantastically engaged with FSRP," as well as Early Access, and his proactive approach to daycare. Daycare workers told her the father "was great to . . . work with and he took direction well and advice well." Gill testified to the father's positive relationship with C.Z., describing their interactions: "[He] plays with her. He gets on the floor and engages with her. He's attune to her needs. He communicates well with her." She noted, that even after not seeing her father for three weeks,

> she still knows that he's Dad. She still knows that he's going to meet her needs, that he's going to provide for her, and he provides a sense of safety for her and affection and love, and that's clear when you see them interact.

Jessica O'Brien, the DHS supervisor, had been involved in the prior case terminating the father's parental rights to his son, M.C. O'Brien testified that in comparison to M.C.'s case, the father's "level of

involvement [with C.Z.] has been completely different." She emphasized that,

> He has consistently attended his mental health therapy. He's followed his Suboxone regimen. He has attended treatment as requested. He's provided drug screens for the department.
>
> He's been extremely consistent in his contact with [C.Z.], and those have been very positive interactions.

Lauren Tucker, the FSRP worker, had been involved with the case since November 2019. She supervised the father's visits with C.Z. She testified that she did not see any signs the father was under the influence. She testified that at the time of the hearing, the father was capable of caring for C.Z.

Lori Rogerson testified, based on working with C.Z.'s family since March 2019, she had no concerns about the father's ability to take care of C.Z. She agreed it was in C.Z.'s best interest for her to be returned to her father's care, noting that, in terms of C.Z.'s progress, "[t]he most progress, definitely, was made in that time that she was -- the most time she was with [the father] for sure."

Whitney Gamm, a social worker with DHS, had been involved in M.C.'s case and in that case had recommended the father's rights be terminated. By contrast, she testified the father was proactive in C.Z.'s case and engaged in the services provided to him. Ms. Gamm recommended that C.Z. be returned to her father with a "high level of supervision."

The substance abuse counselor, Lindsey Veitz, had worked with the father since November 2018. She testified that the father's tests were negative for all substances other than the suboxone. She noted the difficulties the COVID-19 pandemic had presented to patients, especially isolation. At the time of the father's relapse, they were not doing any in-

person counseling. The father completed a relapse prevention plan, and continued his prescription, counseling, and drug tests; she testified all his drug tests at Covert Action since the relapse had been clean. Veitz believed that the father was better equipped to avoid another relapse because of his work on relapse prevention. The judge, however, stated that Veitz "appeared to be shocked" by the information that the father had said he had drank alcohol along with the cocaine. When asked whether it would be a concern if the father had been drinking alcohol, Veitz said it would depend on the "frequency and amount."

The county attorney, the foster parents, and the GAL requested that the father's parental rights be terminated and that C.Z. remain with the foster parents. DHS requested that termination be denied and C.Z. be returned to her father. The father's attorney agreed, emphasizing his employment, housing, and ability to provide for C.Z.'s needs. In the alternative, the father's attorney argued that C.Z. should be placed with her paternal grandfather.

The juvenile court terminated the father's parental rights on October 13, referencing his "substance abuse, deceit and dysfunction." The juvenile court found that the grandfather was not a suitable placement, noting his OWI that was not reported to the court. The court also pointed out the grandfather's lack of appropriate boundaries with his son, including the grandfather watching C.Z. when her father went to Grumpy Goat, and referred to an incident in M.C.'s case when the father allegedly used the grandfather "as a scapegoat to explain his detox drink which he used to pass urine drug tests." The court granted guardianship and custody to the foster parents.

The State through the attorney general's office and the father appealed. We retained the case. On appeal, the county attorney argues it

has authority to respond to the appeal under Iowa Code sections 232.114 and 232.90. The county attorney, foster parents, and GAL argue to affirm the termination order while the State and the father argue for reversal.

## II. Standard of Review.

"We review proceedings terminating parental rights de novo." *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018) (quoting *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014)). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (quoting *In re A.M.*, 843 N.W.2d at 110). "As always, our fundamental concern is the child's best interests." *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014).

## III. Analysis.

**A. The County Attorney Has Authority to Respond to the Petition on Appeal.** As noted, the father and the State appealed the termination order. The attorney general represented the State in juvenile court, and continues to represent the State on appeal advocating DHS's position that the termination order should be reversed. The State is adverse to the Polk County Attorney, who advocated for termination in juvenile court and joined the GAL and foster parents' response to the appeal requesting that we affirm the termination order. We must decide a question of first impression: whether the county attorney can participate in an appeal from an order terminating parental rights. We raised the issue and asked the parties and county attorney to brief it. The State argues the county attorney lacks authority to participate, relying on *In re A.W.*, 741 N.W.2d 793 (Iowa 2007). The Polk County Attorney argues that its participation is authorized by the 2013 amendment to Iowa Code section 232.114 enacted in response to *In re A.W.* We agree with the county attorney.

In *In re A.W.*, the state filed a CINA petition and removed two children from the custody of their parents, who had a history of substance abuse. 741 N.W.2d at 799. The Winnebago Tribe filed a motion to intervene but because they did not appear at the hearing or present evidence, the court held that Iowa's Indian Child Welfare Act (ICWA) was inapplicable. *Id.* at 800. When the parents "stopped working toward substance abuse recovery and reunification," the court ordered the Woodbury County Attorney to file a termination of parental rights petition; the county attorney filed the petition and served notice on the tribe. *Id.* The court then granted the tribe's motion to intervene and rejected the county attorney's constitutional challenge to the ICWA. *Id.* The county attorney appealed, "claiming to act for himself and the State of Iowa." *Id.* The attorney general moved to dismiss the appeal, arguing that the county attorney could not appeal without the attorney general's consent. *Id.* We dismissed the county attorney from the appeal, stating:

> [T]he Iowa Code, as a general proposition, designates the county attorney as the representative of the State of Iowa in the district courts, and the attorney general as the State's representative in the appellate courts. Absent a specific statutory directive to the contrary, county attorneys' appearances in the appellate courts are limited to representation of the interests of the county.

*Id.* at 801–03. We noted the statute governing the county attorney's role in CINA proceedings did not mention appeals, and concluded that "if the General Assembly had intended to grant county attorneys broader authority to represent the State's interests in the appellate courts . . . it would have done so explicitly in section 331.756(2) or chapter 232." *Id.* at 802.

In response to *In re A.W.*, the legislature in 2013 amended both Iowa Code sections 232.90 (governing CINA) and 232.114 (governing

terminations).  2013 Iowa Acts, ch. 113, §§ 2, 3 (codified at Iowa Code §§ 232.90, .114 (2014)).  Section 232.114(3) now reads:

> If there is disagreement between the department and the county attorney regarding the appropriate action to be taken, the department may request *that the state* be represented by the attorney general in place of the county attorney.  *If the state is represented by the attorney general, the county attorney may continue to appear in the proceeding and may present the position of the county attorney regarding the appropriate action to be taken in the case.*

Iowa Code § 232.114(3) (2020) (emphasis added).  The italicized language was added by the 2013 amendment to sections 232.90 and 232.114(3).  The attorney general appeared for the State (DHS) in this case, and all agree that the amendment allowed the Polk County Attorney to continue to appear in the termination proceeding in juvenile court.  The fighting issue is whether "the proceeding" includes the appeal.

We read related statutes together.  Iowa Code section 13.2(1)(*a*) provides that it is the attorney general's duty to "[p]rosecute and defend all causes in the appellate courts in which the state is a party or interested."  Iowa Code section 331.756(2) states the county attorney shall "[a]ppear for the state and the county in all cases and proceedings in the courts of the county."  Neither section expressly grants the county attorney a role in an appellate proceeding in which the county is not a party.  Iowa Code section 232.133(1) governs appeals from CINA and termination cases and allows appeals by "[a]n interested party."  But the county attorney is not a "party" in the juvenile court proceeding to terminate parental rights. *See In re A.W.*, 741 N.W.2d at 803.  Accordingly, the State argues the county attorney's role remains limited to the proceeding in juvenile court.

The purpose of the 2013 amendment to section 232.114(3), however, is to allow the county attorney to remain in the termination proceeding when adverse to the State.  That purpose would be thwarted if the county

attorney could not be heard on appeal in the same case. When litigants are adverse, we do not ordinarily limit the right to appeal to one adversary and not the other. Why limit an advocate to the early innings and deny a role in the later innings that can change the outcome? Letting county attorneys continue with the appeal is less burdensome than their role in juvenile court when they get to question witnesses. On appeal, all advocates are stuck with the record already made. That is why we freely allow amici on appeal but there is no regularized amicus practice at the trial court level.

The 2013 amendment is not expressly limited to the *juvenile court* proceeding. If the legislature had intended to limit the county attorney's continuing participation to the juvenile court proceeding, it presumably would have done so. The plain meaning of the term "the proceeding" easily includes an appeal in the same case. *See, e.g., State v. Pexa*, 574 N.W.2d 344, 347 (Iowa 1998) (holding for double jeopardy purposes, "[t]he district court's original decision, our decision on appeal, and the district court's decision on remand is a continuous judicial examination of defendant's guilt in the *same proceeding*.") (emphasis added); *Ellefson v. Centech Corp.*, 606 N.W.2d 324, 339 (Iowa 2000) ("[T]he term 'proceeding,' means any application to a court of justice . . . for any remedial object." (quoting 1A C.J.S. *Actions* § 7(a), at 318–19 (1985))); *Proceeding, Webster's Third New International Dictionary* (unabr. ed. 2002) (defining "proceedings" as "the course of procedure in a judicial action or in a suit in litigation"); *Proceeding, Black's Law Dictionary* (5th ed. 1979) (Proceeding "may be used synonymously with 'action' or 'suit' to describe the entire course of an action at law or suit in equity."); *see also Larson Mfg. Co. v. Thorson*, 763 N.W.2d 842, 851 (Iowa 2009) ("The commissioner's appeal decision and the remand decision are parts of a single action, not adjudications of

consecutive actions in which the doctrine of issue preclusion might have application."). We now construe the "proceeding" in section 232.114(3) to include the trial and appellate level.

The dissent contends that Iowa Code section 13.2(1)(*a*) (providing that the attorney general represents the State in the appellate courts) trumps section 232.114(3). We disagree. There is no conflict. The attorney general still has the exclusive right to represent the State (DHS) on appeal. The county attorney merely gets to participate and argue a different position. Section 13.2 is not overridden. And any tension between these statutes is resolved by our canon of construction that the specific provision controls over the general. Iowa Code § 4.7 ("If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision."). Section 232.114(3) is limited to the specific (and rare) circumstance where the county attorney and DHS disagree on whether a person's parental rights should be terminated and the attorney general takes over representing DHS. This specific statute controls over the general provision in section 13.2(1)(*a*) applicable to all appeals, not just those from terminations under chapter 232.

Yet another canon supports our interpretation. The 2013 amendment to section 232.114 is the more recent enactment. Section 13.2(1)(*a*) was already on the books. If, as the dissent contends, these statutes are irreconcilable, "the statute latest in date of enactment by the general assembly prevails." Iowa Code § 4.8.

We hold the county attorney is authorized to participate in this appeal.

**B. The Grounds for Termination Were Not Proven.** "We use a three-step analysis to review termination of parental rights." *In re A.S.*, 906 N.W.2d at 472. "First, we 'determine whether any ground for termination under section 232.116(1) has been established.' " *Id.* at 472–73 (quoting *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016)). "If we determine 'that a ground for termination has been established, then we determine whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights.' " *Id.* at 473 (quoting *In re M.W.*, 876 N.W.2d at 219–20). "Finally, if we conclude the statutory best-interest framework supports termination, 'we consider whether any exceptions in section 232.116(3) apply to preclude termination of parental rights.' " *Id.* (quoting *In re M.W.*, 876 N.W.2d at 219–20). Because we hold that the grounds for termination were not proven, we do not address the second and third steps.

The juvenile court terminated the father's parental rights under subsections 232.116(1)(*g)* and (*h*). Under Iowa Code section 232.116(1)(*g*), the court may terminate parental rights if:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
>
> (2) The court has terminated parental rights pursuant to section 232.117 with respect to another child who is a member of the same family or a court of competent jurisdiction in another state has entered an order involuntarily terminating parental rights with respect to another child who is a member of the same family.
>
> (3) There is clear and convincing evidence that the parent continues to lack the ability or willingness to respond to services which would correct the situation.
>
> (4) There is clear and convincing evidence that an additional period of rehabilitation would not correct the situation.

Elements one and two are not disputed: C.Z. has been adjudicated a child in need of assistance and the father's parental rights to C.Z.'s brother M.C.

have been terminated. On our de novo review of the record, including the facts we reviewed above, we disagree with the juvenile court's determination that there was clear and convincing evidence that the father lacked the ability or willingness to respond to services. His proactivity throughout the case establishes he had both the ability *and* the willingness to respond to services. The father attended mental health counseling, substance abuse counseling, and Early Access sessions. The testimony of the therapist, counselor, and Early Access social worker showed the father's responsiveness to these services. The CASA and FSRP worker stated his visits with C.Z. were positive; he demonstrated an eagerness to learn how to care for his daughter and a concern with her well-being. The father attended most of the offered visits, while a few were cancelled due to C.Z. or her father not feeling well. Three DHS workers and the FSRP worker testified as to the father's responsiveness to services. Their testimony demonstrated the father's cooperation throughout the case and ultimately, all agreed that he was capable of caring for C.Z.

The father violated a court order, drank alcohol after his relapse, and provided one tampered drug screen and a positive drug test. However, he showed remorse, admitted his alcohol use at the termination hearing, and provided negative drug screens after the tampered drug screen. He testified he had completely abstained from alcohol in the past few months and he understood that he should not have alcohol, as it had been a proven trigger.

The father at times was less than forthcoming and showed poor judgment when he insulted the judge on a recorded line and when he delayed reporting his relapse. His relapse prompted DHS to seek termination. But he made amends and got back on track. DHS ultimately changed its position and recommended C.Z. be returned to her father.

In its eighty-two-page order, the juvenile court included almost fifteen pages of negative information from the prior termination case involving C.Z.'s brother. We are persuaded by the witnesses involved in both proceedings who found the father had greatly improved and was ready to care for his daughter. In our view, clear and convincing evidence does not support termination under section 232.116(1)(*g*).

Under Iowa Code section 232.116(1)(*h*), the court may terminate parental rights if:

> (1) The child is three years of age or younger.
>
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
>
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
>
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

There is no dispute as to the first three elements: C.Z. is less than three years old, has been adjudicated a CINA, and has been removed from the parents' custody since November 19, 2018. We find that clear and convincing evidence is lacking that C.Z. could not have been safely returned to her father's custody at the time of the August hearing. Key witnesses testified that it was in C.Z.'s best interest to be immediately returned to the father's care.

Given the father's proven commitment to his daughter and engagement with the provided services, we determine that the grounds for termination under section 232.116(1)(*g*) or (*h*) were not proven by clear and convincing evidence.

**IV. Disposition.**

For those reasons, we reverse the juvenile court's order terminating the father's parental rights.

**REVERSED.**

Christensen, C.J., and Mansfield, Oxley, and McDermott, JJ., join this opinion. McDonald, J., files an opinion concurring in part and dissenting in part, in which Appel, J., joins.

**McDONALD, Justice (concurring in part and dissenting in part).**

I concur in the majority's reversal of the termination order, but I respectfully dissent from the majority's conclusion that Iowa Code section 232.114 (2020) authorizes the county attorney to prosecute and defend appeals involving the termination of parental rights alongside or in opposition to the attorney general. The majority's construction of the statute creates an untenable conflict between the attorney general's appellate authority under Iowa Code section 13.2 and the county attorney's authority under Iowa Code section 232.114. To avoid this untenable conflict, our rules of statutory construction provide we should more narrowly construe the county attorney's authority under Iowa Code section 232.114. Under the more narrow construction, I would hold Iowa Code section 232.114 authorizes the county attorney to continue to appear only in the district court proceeding after being replaced as legal counsel by the attorney general and does not authorize the county attorney to independently prosecute or defend cases on appeal.

As a general rule, "[w]e read related statutes together and attempt to harmonize them." *In re A.M.*, 856 N.W.2d 365, 372 (Iowa 2014). As a general rule of statutory construction, "[i]f a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both." Iowa Code § 4.7. "If statutes cannot be harmonized, the specific provision will 'prevail[ ] as an exception to [a] general provision.' " *Papillon v. Jones*, 892 N.W.2d 763, 773 (Iowa 2017) (alterations in original) (quoting Iowa Code § 4.7).

The statutes relevant to our inquiry involve the authority of the attorney general and the county attorney, respectively. "The offices of attorney general and county attorney are creatures of statute, and the

respective authority of each person holding them is detailed in the Iowa Code." *In re A.W.*, 741 N.W.2d 793, 801 (Iowa 2007). It is the statutory duty of the attorney general to "[p]rosecute and defend *all* causes in the appellate courts in which the state is a party or interested." Iowa Code § 13.2(1)(*a*) (emphasis added); *see also State v. Gill*, 259 Iowa 142, 143, 143 N.W.2d 331, 332 (1966). The word "all" means "the whole of . . . referring to amount, quantity, extent, duration, quality, or degree." *All, Black's Law Dictionary* (rev. 4th ed. 1968). The attorney general's authority to prosecute and defend appeals in which the state is a party or interested is thus total, plenary, and exclusive. "In contrast, it is the county attorney's duty to '[a]ppear for the state and the county in all cases and proceedings in the courts of the county to which the state or the county is a party.'" *In re A.W.*, 741 N.W.2d at 801 (alterations in original) (emphasis omitted) (quoting Iowa Code § 331.756(2)); *see also Gill*, 259 Iowa at 143, 143 N.W.2d at 332.

The majority's construction of the county attorney's authority to prosecute and defend appeals under the specific provision in section 232.114 creates a conflict with the attorney general's authority to prosecute and defend appeals under the general provision in section 13.2. Under the majority's construction of section 232.114, the attorney general no longer has total, exclusive, and plenary authority to represent the state on appeal in cases arising under chapter 232.

Consider the practical implications of this construction as evidenced in this case. The assistant county attorney in this case has no client. Yet, the majority concludes the assistant county attorney has the authority to defend a judgment contrary to the wishes of her former client, the Iowa Department of Human Services, and contrary to the position of the attorney general, the top law enforcement officer in the state, who has the

statutory duty and authority to present the official legal position of the state, and who also has supervisory authority over county attorneys. That is a shocking development. It is one thing to allow the county attorney to continue to appear in the district court proceeding to present his or her *personal* views regarding disposition of the case. It is wholly another thing to allow the county attorney or assistant county attorney to participate in an appeal contrary to the wishes of a state agency and contrary to the legal position of the top law enforcement officer in the state actually representing the state agency. This practical consideration counsels strongly against the majority's construction of the statute.

I respectfully suggest a more limited construction of section 232.114 avoids this untenable statutory conflict and is a better interpretation of section 232.114. First consider the circumstances surrounding the amendment to section 232.114. As the majority notes, section 232.114 was amended in response to this court's decision in *In re A.W.*, 741 N.W.2d 793. That case involved the county attorney's authority to participate in appeals arising out of assistance proceedings under chapter 232. *In re A.W.*, 741 N.W.2d at 801. At that time, the county attorney's duties in assistance proceedings and termination proceedings were as follows:

> The county attorney shall represent the department in proceedings arising under this division. However, if there is disagreement between the department and the county attorney regarding the appropriate action to be taken, the department may request to be represented by the attorney general in place of the county attorney.

Iowa Code §§ 232.90(2) (involving assistance proceedings), .114(2) (involving termination proceedings) (2013).

In *In re A.W.*, the attorney general moved to dismiss the county attorney from the appeal, arguing the county attorney could "not represent

the State of Iowa in the appellate courts without authorization from the attorney general." 741 N.W.2d at 801. We agreed. *See id.* We first noted the authority of the respective offices was governed by statute. *See id.* Under the relevant statutes, we concluded the attorney general was "the State's representative in the appellate courts." *Id.* The county attorney argued section 232.90 granted him the authority to represent the state in juvenile and appellate courts. *See id.* That provision provided "[t]he county attorney shall represent the state in proceedings arising from a [CINA petition]." *Id.* (alterations in original) (quoting Iowa Code § 232.90(1)). We rejected the argument, explaining section 232.90(1) "does not mention appeals in CINA cases, and there is nothing in the statute suggesting a legislative intent to alter the standard division of authority between the attorney general and county attorneys." *Id.* We also found "dubious the county attorney's assertion that, absent his participation in CINA appeals, important interests, issues, and arguments will never be raised." *Id.* at 803. We explained that "the attorney general is fully capable of representing the State's interests." *Id.* We also rejected the county attorney's argument that he was a party in interest in the case. *See id.* "[T]he State of Iowa, appearing in the juvenile court through the department of human services, is a 'party in interest' in CINA cases." *Id.* We noted that the county attorney did not even have the authority to continue to participate in the juvenile court proceedings in the district court contrary to the wishes of the department of human services or the attorney general:

> Even in the juvenile court, the county attorney does not have the exclusive authority to represent the interests of the State. Section 232.90(2) indicates that in instances of "disagreement between the department [of human services] and the county attorney regarding the appropriate action to be taken [in matters pending before the juvenile court], the department

may request to be represented by the attorney general in place of the county attorney." The statute thus recognizes that, as they are representatives of the same interests, when conflicts arise between the attorney general and a county attorney regarding the prosecution of a CINA matter, the attorney general shall represent the State's interest even in the juvenile court.

*Id.* at 802 n.7 (alterations in original).

In response, the legislature amended the relevant statute in assistance cases, section 232.90, and in termination cases, section 232.114. Section 232.114 now provides in relevant part:

> 1. As used in this section, "*state*" means the general interest held by the people in the health, safety, welfare, and protection of all children living in this state.
>
> . . . .
>
> 3. If there is disagreement between the department and the county attorney regarding the appropriate action to be taken, the department may request that the state be represented by the attorney general in place of the county attorney. If the state is represented by the attorney general, the county attorney may continue to appear in the proceeding and may present the position of the county attorney regarding the appropriate action to be taken in the case.

Iowa Code § 232.114 (2020) (emphasis added).

When viewed in context, it seems clear the amendments to sections 232.90 and 232.114 were meant to address the issue raised in footnote 7 of *In re A.W.* where we explained the county attorney had no authority to continue in the juvenile court proceeding contrary to the department of human services and the attorney general. The amendments directly address this issue and provide clearly that the county attorney shall be allowed to continue to appear in the juvenile court proceeding even where the attorney general has appeared. The amendments do not mention appeals in assistance or termination proceedings or suggest any intent to alter the attorney general's plenary and exclusive appellate authority

under section 13.2. It seems odd to construe these amendments to authorize the county attorney to prosecute or defend appeals given that neither amendment mentions appeals and given that the primary rationale for our holding in *In re A.W.* was the lack of any statutory text referencing appeals. *See In re A.W.*, 741 N.W.2d at 801 (noting section 232.90(1) "does not mention appeals in CINA cases"). Stated differently, it seems reasonable to conclude the legislature would have included an explicit reference to the county attorney's appellate authority if the omission of any such language was the textual defect in the statute the legislature intended to change.

Next consider the text of section 232.114. The fair and ordinary meaning of the statute when viewed as a whole and in context does not support the majority's interpretation. *See* Iowa Code § 4.1(38) ("Words and phrases shall be construed according to the context and the approved usage of the language . . . ."); *State v. Davis*, 922 N.W.2d 326, 330 (Iowa 2019) ("We give words their ordinary meaning absent legislative definition."); *State v. Doe*, 903 N.W.2d 347, 351 (Iowa 2017) (stating we consider the "relevant language, read in the context of the entire statute"); *In re Marshall*, 805 N.W.2d 145, 158 (Iowa 2011) ("We should give the language of the statute its fair meaning, but should not extend its reach beyond its express terms."). Under the plain language of the statute, it does not appear that the statute grants the county attorney any authority to initiate, prosecute, defend, or in any way participate in appeals arising under chapter 232. *See* Iowa Code § 232.114. The statute does not reference, explicitly or implicitly, appeals. *Id.* Instead, the statute provides only that if the attorney general is asked to represent the state in a chapter 232 proceeding, the county attorney "may continue to appear in the proceeding." *Id.* Every attorney appearing in a civil proceeding must file

an appearance indicating the party the attorney represents. *See* Iowa R. Civ. P. 1.404. The amendment merely allows the county attorney to continue to appear and participate in the case despite no longer having a client in the case. Further, the county attorney's continued appearance is only for the "the proceeding" and "the case." *See* Iowa Code § 232.114(3). Use of the definite article particularizes the county attorney's appearance to the particular proceeding or case in which the county attorney had already appeared and which the statute allows to "continue." *See id*; *Doe v. State*, 943 N.W.2d 608, 611 (Iowa 2020) (use of the definite article "the" particularizes the following noun).

The majority reaches the opposite conclusion, holding that the term "proceeding" encompasses appellate proceedings. In my view, there are two problems with this conclusion. First, that is exactly the argument this court rejected in *In re A.W.* *See* 741 N.W.2d at 801 (rejecting county attorney's argument that he had right to participate in appeal based on contention that section 232.90 authorized the county attorney to "represent the state in *proceedings* arising from a [CINA petition]" (emphasis added) (alteration in original) (quoting Iowa Code § 232.90(1))). The amendments did not purport to redefine the term "proceeding" in response to our holding that "proceeding," as used in section 232.90, did not include appeals.

Second, the majority's redefinition of the word "proceeding" to now include appellate court proceedings is problematic when applied throughout the remainder of chapter 232 and counsels against the majority's interpretation. *See Farmers Coop. Co. v. DeCoster*, 528 N.W.2d 536, 538–39 (Iowa 1995) (per curiam) ("Identical statutory language in different statutes should be given much the same meaning."). For example, Iowa Code section 232.12 provides the county attorney shall

represent the state "in all" delinquency "proceedings." If the word proceedings now includes appellate proceedings, the county attorney is now required to represent the state in appeals from delinquency proceedings. By way of another example, Iowa Code section 232.91(1) provides that any "proceedings" "subsequent to the filing of a petition shall not take place without the presence of the child's parent, guardian, custodian, or guardian ad litem." Almost all cases on appeal arising under chapter 232 are submitted without oral argument. I do not think this provision requires appellate proceedings to be conducted with oral argument in the presence of the parents, but it might now. In addition, the same section provides that "[a]n agency, facility, institution, or person, including a foster parent or an individual providing preadoptive care, may petition the court to be made a party to proceedings" involving assistance cases. Iowa Code § 232.91(2). Are these entities and persons now entitled to petition to be made a party to appeals arising under chapter 232? If the word proceedings includes appellate proceedings and carries consistent meaning throughout chapter 232, then perhaps so. "The need for uniformity becomes more imperative where the same word or term is used in different statutory sections that are similar in purpose and content." *Farmers Coop. Co.*, 528 N.W.2d at 538. Applying a uniform definition of proceeding to include appellate proceedings is problematic and counsels against such an interpretation.

In my view, the rules of statutory construction require a construction of the statute that gives effect to section 232.114 without infringing the attorney general's authority under section 13.2. In that light, I would hold section 232.114 does not authorize the county attorney to participate in appeals from assistance or termination proceedings.

Appel, J., joins this concurrence in part and dissent in part.